

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA          )
Ex Rel. JAMES HUGH POTTS II,      )
STATE OF CALIFORNIA, STATE OF     )
COLORADO, STATE OF CONNECTICUT,   )
STATE OF DELAWARE, STATE OF       )
FLORIDA, STATE OF GEORGIA, STATE  )
OF ILLINOIS, STATE OF INDIANA,    )
STATE OF LOUISIANA, STATE OF      )
MASSACHUSETTS, STATE OF MICHIGAN, )
STATE OF MINNESOTA, STATE OF NEVADA)
STATE OF NEW JERSEY, STATE OF NEW )
MEXICO, STATE OF OKLAHOMA, STATE OF)
TENNESSEE, STATE OF TEXAS, and    )
COMMONWEALTH OF VIRGINIA, Ex Rel. )
JAMES HUGH POTTS II,              )
                                  )
             Plaintiffs,          )        CIVIL ACTION NO.
                                  )        1:12-CV-0963-RLV
                                  )
VS.                               )
                                  )        ~~FILED EX PARTE~~
                                  )        ~~AND UNDER SEAL~~
                                  )        Per Judge Vining
UNIVERSAL HEALTH SERVICES, INC.,  )
UHS OF DELAWARE, INC., UHS OF     )        JURY DEMANDED 2/28/14
PEACHFORD, L.P. (D/B/A PEACHFORD  )
BEHAVIORAL HEALTH SYSTEM OF       )
ATLANTA), 1000 PARCHMENT DRIVE    )
LLC, ABS LINCS DC, LLC, ABS LINCS )
KY, INC. (D/B/A CUMBERLAND HALL   )
HOSPITAL), ABS LINCS NJ, INC.,    )
ABS LINCS PA, INC., ABS LINCS SC, )
INC. (D/B/A PALMETTO SUMMERVILLE  )
BEHAVIORAL HEALTH), ABS LINCS TN, )
INC., ABS LINCS TX, INC., ABS     )
LINCS VA, INC. (D/B/A FIRST HOME  )
CARE-VA), ABS LINCS, LLC,         )
ABS-FIRST STEP, INC., AHG, AIKEN  )
PROFESSIONAL ASSOCIATION, LLC,    )
AIKEN REGIONAL MEDICAL CENTERS,   )
INC. (D/B/A AIKEN REGIONAL MEDICAL)
CENTERS AND AURORA PAVILION       )
BEHAVIORAL HEALTH SERVICES), AIKEN)
REGIONAL RECEIVABLES, L.L.C.,     )

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 1 8 2014

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

1

ALABAMA CLINICAL SCHOOLS, INC. )
D/B/A ALABAMA CLINICAL SCHOOLS), )
ALICANTE SCHOOL ELK GROVE, LLC, )
ALLIANCE CROSSINGS, LLC, ALLIANCE )
HEALTH CENTER, INC. (D/B/A )
ALLIANCE HEALTH CENTER), )
ALTERNATIVE BEHAVIORAL SERVICES, )
INC., AMARILLO CLINICAL SERVICES, )
INC., AMBULATORY SURGERY CENTER OF )
TEMECULA VALLEY, INC., AMBULATORY )
SURGICAL CENTER OF AIKEN, L.L.C., )
ARBOUR ELDER SERVICES, INC. (D/B/A )
ARBOUR SENIOR CARE), ARBOUR )
FOUNDATION, INC., ARKANSAS SURGERY )
CENTER OF FAYETTEVILLE, LIMITED )
PARTNERSHIP, ARROWHEAD BEHAVIORAL )
HEALTH, LLC (D/B/A ARROWHEAD )
BEHAVIORAL HEALTH), ASC OF AIKEN, )
INC., ASC OF CORONA, INC., ASC OF )
EAST NEW ORLEANS, INC., ASC OF LAS )
VEGAS, INC., ASC OF MIDWEST CITY, )
INC., ASC OF PALM SPRINGS, INC., )
ASC OF PUERTO RICO, INC., ASC OF )
RENO, INC., ASC OF WELLINGTON, )
INC., ASC PROPERTY MANAGEMENT, )
INC., ASSOCIATED CHILD CARE )
EDUCATIONAL SERVICES INC. (D/B/A )
CREEKSIDE ACADEMY), ATLANTIC SHORES )
HOSPITAL, LLC (D/B/A ATLANTIC )
SHORES HOSPITAL), AUBURN REGIONAL )
MEDICAL CENTER, INC. (D/B/A AUBURN )
REGIONAL MEDICAL CENTER), AUBURN )
REGIONAL MEDICAL GROUP, AUBURN )
REGIONAL RECEIVABLES, L.L.C., )
BEHAVIORAL EDUCATIONAL SERVICES, )
INC. (D/B/A FIELDSTONE )
PREPARATORY, HORACE MANN ACADEMY )
AND RIVERDALE COUNTRY SCHOOL), )
BEHAVIORAL HEALTHCARE LLC, )
BENCHMARK BEHAVIORAL HEALTH )
SYSTEM, INC. (D/B/A BENCHMARK )
BEHAVIORAL HEALTH SYSTEM), BHC )
ALHAMBRA HOSPITAL, INC. (D/B/A )
ALHAMBRA HOSPITAL), BHC BELMONT )
PINES HOSPITAL, INC. (D/B/A )
BELMONT PINES HOSPITAL), BHC CEDAR )
VISTA HOSPITAL, INC., BHC FAIRFAX )

2

HOSPITAL, INC., BHC FORT                    )
LAUDERDALE HOSPITAL, INC., BHC FOX )
RUN HOSPITAL, INC. (D/B/A FOX RUN  )
CENTER FOR CHILDREN AND               )
ADOLESCENTS), BHC FREMONT          )
HOSPITAL, INC. (D/B/A FREEMONT      )
HOSPITAL), BHC HEALTH SERVICES OF )
NEVADA, INC.(D/B/A WEST HILLS        )
HOSPITAL), BHC HERITAGE OAKS       )
HOSPITAL, INC. (D/B/A HERITAGE      )
OAKS HOSPITAL), BHC HOLDINGS,       )
INC., BHC INTERMOUNTAIN HOSPITAL, )
INC. (D/B/A INTERMOUNTAIN            )
HOSPITAL), BHC MANAGEMENT SERVICES )
OF LOUISIANA, LLC, BHC MANAGEMENT )
SERVICES NEW MEXICO, LLC, BHC       )
MANAGEMENT SERVICES OF STREAMWOOD, )
LLC (D/B/A CHICAGO CHILDREN'S        )
CENTER FOR BEHAVIORAL HEALTH), BHC )
MESILLA VALLEY HOSPITAL, LLC         )
(D/B/A MESILLA VALLEY HOSPITAL),    )
BHC MONTEVISTA HOSPITAL, INC.        )
(D/B/A MONTEVISTA HOSPITAL), BHC    )
NORTHWEST PSYCHIATRIC HOSPITAL,     )
LLC (D/B/A BROOKE GLEN BEHAVIORAL  )
HOSPITAL), BHC OF INDIANA, GENERAL )
PARTNERSHIP, BHC PINNACLE POINTE    )
HOSPITAL, INC. (D/B/A PINNACLE       )
POINTE HOSPITAL), BHC PROPERTIES,   )
LLC, BHC SIERRA VISTA HOSPITAL,      )
INC. (D/B/A SIERRA VISTA             )
HOSPITAL),BHC SPIRIT OF ST. LOUIS   )
HOSPITAL, INC., BHC STREAMWOOD       )
HOSPITAL, INC. (JOHN COSTIGAN        )
RESIDENTIAL CENTER, ROCK RIVER       )
RESIDENTIAL CENTER AND STREAMWOOD   )
BEHAVIORAL HEALTH SYSTEM), BHC      )
WINDSOR HOSPITAL, INC.,              )
BLOOMINGTON MEADOWS, GENERAL        )
PARTNERSHIP (D/B/A BLOOMINGTON      )
MEADOWS HOSPITAL), BRADEN RIVER     )
INTERNAL MEDICINE ASSOCIATES, LLC, )
BRENTWOOD ACQUISITION, INC.          )
(D/B/A BRENTWOOD BEHAVIORAL HEALTH )
OF MISSISSIPPI), BRENTWOOD          )
ACQUISITION-SHREVEPORT, INC.         )
(D/B/A BRENTWOOD HOSPITAL), BRYNN   )

MARR HOSPITAL, INC. (D/B/A BRYNN )
MARR HOSPITAL), BY THE SEA )
PHYSICIAN PRACTICE, LLC, CALVARY )
CENTER, INC. (D/B/A CALVARY )
ADDICTION RECOVERY CENTER), CANYON )
RIDGE HOSPITAL, INC. (D/B/A CANYON )
RIDGE HOSPITAL), CANYON RIDGE REAL )
ESTATE, LLC, CAPITOL RADIATION )
THERAPY, L.L.P., CASA DE LAGO, )
L.L.C., CCS/BAY COUNTY, INC., )
CCS/LANSING, INC. (D/B/A TURNING )
POINT YOUTH CENTER), CCS/LITTLE )
ROCK, INC., CCS/MEADOW PINES, )
INC.,CEDAR SPRINGS HOSPITAL REAL )
ESTATE, INC., CEDAR SPRINGS )
HOSPITAL, INC. (D/B/A CEDAR )
SPRINGS BEHAVIORAL HEALTH SYSTEM), )
CENTENNIAL PEAKS HOSPITAL, LLC, )
CENTRAL MONTGOMERY MEDICAL CENTER, )
L.L.C., CENTRAL MONTGOMERY )
RECEIVABLES, L.L.C., CHALMETTE )
MEDICAL CENTER, INC., CHILDREN'S )
COMPREHENSIVE SERVICES, INC., )
CHILDREN'S HOSPITAL OF VICKSBURG, )
L.L.C., CHILDREN'S TREATMENT )
SOLUTIONS, LLC, CHOATE HEALTH )
MANAGEMENT, INC., COLLABORATIVE )
CARE LLC, COLUMBUS HOSPITAL )
PARTNERS, LLC, COLUMBUS HOSPITAL, )
LLC (D/B/A COLUMBUS BEHAVIORAL )
CENTER FOR CHILDREN AND )
ADOLESCENTS), COMMUNITY BEHAVIORAL )
HEALTH, L.L.C. (D/B/A COMMUNITY )
BEHAVIORAL HEALTH), COMMUNITY )
CORNERSTONES, INC. (D/B/A )
COMMUNITY CORNERSTONES), COMPASS )
HOSPITAL, INC., COMPREHENSIVE )
OCCUPATIONAL AND CLINICAL HEALTH, )
INC., CORNERSTONE HOSPITAL )
MANAGEMENT, LLC, CORNERSTONE )
REGIONAL HOSPITAL, LP (D/B/A )
CORNERSTONE REGIONAL HOSPITAL), )
CORONA MEDICAL OFFICES, LLC, )
CRAWFORD FIRST EDUCATION, INC., )
CUMBERLAND HOSPITAL PARTNERS, LLC, )
CUMBERLAND HOSPITAL, LLC (D/B/A )
CUMBERLAND HOSPITAL), CYPRESS )

4

CREEK REAL ESTATE, L.P., DEL AMO )
HOSPITAL, INC. (D/B/A DEL AMO )
HOSPITAL), DELAWARE INVESTMENT )
ASSOCIATES, LLC, DIAGNOSTICS OF )
WELLINGTON, LLC, DIAMOND GROVE )
CENTER, LLC (D/B/A DIAMOND GROVE )
CENTER), DISTRICT HOSPITAL )
PARTNERS RECEIVABLES, L.L.C., )
DISTRICT HOSPITAL PARTNERS, L.P. )
(D/B/A GEORGE WASHINGTON )
UNIVERSITY HOSPITAL), DOCTORS' )
HOSPITAL OF SHREVEPORT, INC., )
EDINBURG AMBULATORY SURGICAL )
CENTER, INC., EDINBURG HOLDINGS, )
INC., EDINBURG MOB PROPERTIES, )
LLC, EDINBURG SURGERY CENTER, )
L.P., ELMIRA NPS, LLC, EMERALD )
COAST BEHAVIORAL HOSPITAL, LLC )
(D/B/A EMERALD COAST BEHAVIORAL )
HOSPITAL), EYE SURGERY SPECIALISTS )
OF PUERTO RICO, L.L.C. (D/B/A )
OJOS/EYE SURGERY SPECIALISTS OF )
PUERTO RICO), FHCHS OF PUERTO )
RICO, INC. (D/B/A FHCHS OF PUERTO )
RICO), FIRST CORRECTIONS PUERTO )
RICO, INC., FIRST HOSPITAL )
CORPORATION OF NASHVILLE, FIRST )
HOSPITAL CORPORATION OF VIRGINIA )
BEACH (D/B/A VIRGINIA BEACH )
PSYCHIATRIC CENTER), FIRST )
HOSPITAL PANAMERICANO, INC. )
(D/B/A FIRST HOSPITAL )
PANAMERICANO), FOREST VIEW )
PSYCHIATRIC HOSPITAL, INC. (D/B/A )
FOREST VIEW HOSPITAL), FORT DUNCAN )
MEDICAL CENTER LADIES AUXILIARY, )
FORT DUNCAN MEDICAL CENTER, INC., )
FORT DUNCAN MEDICAL CENTER, L.P. )
(D/B/A FORT DUNCAN REGIONAL )
MEDICAL CENTER), FORT DUNCAN )
MEDICAL RECEIVABLES, L.L.C., FORT )
LAUDERDALE HOSPITAL, INC. (D/B/A )
FORT LAUDERDALE HOSPITAL), )
FOUNDATIONS FOR HOME AND )
COMMUNITY, INC., FRIENDS )
BEHAVIORAL HEALTH SYSTEM, L.P. )
(D/B/A FRIENDS HOSPITAL), FRIENDS )

GP, LLC, FRONTLINE BEHAVIORAL )
HEALTH, INC., FRONTLINE )
CHILDREN'S HOSPITAL, L.L.C., )
FRONTLINE HOSPITAL, LLC (D/B/A )
NORTH STAR HOSPITAL AND NORTH STAR )
HOSPITAL– BRAGAW CAMPUS), )
FRONTLINE RESIDENTIAL TREATMENT )
CENTER, LLC (D/B/A NORTH STAR )
DEBARR RESIDENTIAL TREATMENT )
CENTER AND NORTH STAR PALMER )
RESIDENTIAL TREATMENT CENTER), )
GLEN OAKS HOSPITAL, INC. (D/B/A )
GLEN OAKS HOSPITAL), GREAT PLAINS )
HOSPITAL, INC. (D/B/A HEARTLAND )
BEHAVIORAL HEALTH SERVICES), GULF )
COAST TREATMENT CENTER, INC. )
(D/B/A GULF COAST TREATMENT )
CENTER, GULF COAST YOUTH SERVICES )
AND OKALOOSA YOUTH ACADEMY), H.C. )
CORPORATION, H.C. PARTNERSHIP )
(D/B/A HILL CREST BEHAVIORAL )
HEALTH SERVICES), HAVENWYCK )
HOSPITAL INC. (D/B/A HAVENWYCK )
HOSPITAL), HEALTH CARE FINANCE & )
CONSTRUCTION CORP., HEART CLINIC, )
P.L.L.C., HHC AUGUSTA, INC. )
(D/B/A LIGHTHOUSE CARE CENTER OF )
AUGUSTA), HHC BERKELEY, INC., HHC )
CONWAY INVESTMENT, INC., HHC )
COOPER CITY, INC., HHC DELAWARE, )
INC. (D/B/A MEADOWWOOD BEHAVIORAL )
HEALTH SYSTEM), HHC FOCUS )
FLORIDA, INC. (D/B/A HIGH POINT )
TREATMENT CENTER), HHC INDIANA, )
INC. (D/B/A MICHIANA BEHAVIORAL )
HEALTH CENTER), HHC KINGWOOD )
INVESTMENT, LLC, HHC OCONEE, )
INC., HHC OHIO, INC. (D/B/A )
WINDSOR-LAURELWOOD CENTER FOR )
BEHAVIORAL HEALTH), HHC )
PENNSYLVANIA, LLC, HHC POPLAR )
SPRINGS, INC. (D/B/A POPLAR )
SPRINGS HOSPITAL), HHC RIVER )
PARK, INC. (D/B/A RIVER PARK )
HOSPITAL), HHC SERVICES, LLC, HHC )
SOUTH CAROLINA, INC. (D/B/A )
LIGHTHOUSE CARE CENTER OF )

CONWAY), HHC ST. SIMONS, INC. )
(D/B/A ST. SIMON'S BY-THE-SEA), )
HHMC PARTNERS, INC., HICKORY )
TRAIL HOSPITAL, L.P. (D/B/A )
HICKORY TRAIL HOSPITAL), HIGH )
PLAINS BEHAVIORAL HEALTH, L.P., )
HMHM OF TENNESSEE, LLC, HOLLY HILL )
HOSPITAL, LLC (D/B/A HOLLY HILL )
HOSPITAL), HOLLY HILL REAL ESTATE, )
LLC, HORIZON HEALTH AUSTIN, INC. )
(D/B/A AUSTIN LAKES HOSPITAL), )
HORIZON HEALTH CORPORATION, )
HORIZON HEALTH HOSPITAL SERVICES, )
LLC, HORIZON HEALTH PHYSICAL )
REHABILITATION SERVICES, LLC, )
HORIZON MENTAL HEALTH MANAGEMENT, )
LLC, HRI CLINICS, INC. (D/B/A )
ARBOUR COUNSELING SERVICES), HRI )
HOSPITAL, INC. (D/B/A ARBOUR-HRI )
HOSPITAL), HSA HILL CREST )
CORPORATION, HSA OF OKLAHOMA, )
INC., HUGHES CENTER, LLC (D/B/A )
HUGHES CENTER), INDIANA )
PSYCHIATRIC INSTITUTES, LLC, )
INFOSCRIBER CORPORATION, KEYS )
GROUP HOLDINGS LLC, KEYSTONE )
CHARLOTTE LLC, KEYSTONE CONTINUUM, )
LLC (D/B/A CEDAR GROVE RESIDENTIAL )
TREATMENT CENTER, MOUNTAIN YOUTH )
ACADEMY, NATCHEZ TRACE YOUTH )
ACADEMY AND UPPER EAST TN JUVENILE )
DETENTION CENTER), KEYSTONE DJJ )
LLC (D/B/A BRISTOL YOUTH ACADEMY), )
KEYSTONE DETENTION LLC, KEYSTONE )
EDUCATION TRANSPORTATION, LLC )
(D/B/A PARKWAY ACADEMY-COTATI), )
KEYSTONE EDUCATION AND YOUTH )
SERVICES, LLC, KEYSTONE JJAEP LLC )
(D/B/A NUECES COUNTY JUVENILE )
JUSTICE ALTERNATIVE EDUCATION )
PROGRAM), KEYSTONE MARION, LLC )
(D/B/A MARION YOUTH CENTER), )
KEYSTONE MEMPHIS, LLC (D/B/A )
COMPASS INTERVENTION CENTER AND )
MCDOWELL CENTER FOR CHILDREN), )
KEYSTONE NPS LLC (D/B/A BLUE )
MOUNTAIN ACADEMY, DESERT VALLEY )

HOPE ACADEMY, MORONGO BASIN )
LEARNING ACADEMY, MISSION BELL )
ACADEMY, MOJAVE RIDGE ACADEMY, )
RANCHO ACADEMY OF LEARNING AND )
RANCHO SAN DIEGO ACADEMY), )
KEYSTONE NEWPORT NEWS, LLC (D/B/A )
NEWPORT NEWS BEHAVIORAL HEALTH )
SYSTEM), KEYSTONE RICHLAND CENTER )
LLC (D/B/A FOUNDATIONS FOR )
LIVING), KEYSTONE SAVANNAH, LLC, )
KEYSTONE WSNC, L.L.C. (D/B/A OLD )
VINEYARD BEHAVIORAL HEALTH )
SERVICES), KEYSTONE/CCS PARTNERS )
LLC, KIDS BEHAVIORAL HEALTH OF )
ALASKA, INC., KIDS BEHAVIORAL )
HEALTH OF UTAH, INC. (D/B/A )
COPPER HILLS YOUTH CENTER), )
KINGWOOD PINES HOSPITAL, LLC, KMI )
ACQUISITION, LLC (D/B/A BROOK )
HOSPITAL-KMI), KOLBURNE SCHOOL, )
LLC, LA AMISTAD RESIDENTIAL )
TREATMENT CENTER, LLC (D/B/A )
CENTRAL FLORIDA BEHAVIORAL )
HOSPITAL AND LA AMISTAD )
BEHAVIORAL HEALTH SERVICES), )
LAKELAND BEHAVIORAL, LLC, )
LAKEWOOD RANCH IMAGING CENTER, )
L.L.C., LAKEWOOD RANCH MEDICAL )
CENTER AUXILIARY, INCORPORATED, )
LAKEWOOD RANCH MEDICAL GROUP, )
LLC, LAKEWOOD RANCH NEUROLOGY, )
LLC, LAKEWOOD RANCH THERAPY, )
INC., LANCASTER HOSPITAL )
CORPORATION (D/B/A PALMDALE )
REGIONAL MEDICAL CENTER), )
LANCASTER HOSPITAL RECEIVABLES, )
L.L.C., LAREDO ASC, INC., LAREDO )
HOLDINGS, INC., LAREDO MOB )
PARTNERS, LTD., LAREDO PROVIDENCE )
MANAGEMENT, L.L.C., LAREDO )
REGIONAL MEDICAL CENTER, L.P. )
(D/B/A DOCTORS' HOSPITAL OF )
LAREDO), LAREDO REGIONAL )
RECEIVABLES, L.L.C., LAREDO )
REGIONAL, INC., LAUREL OAKS )
BEHAVIORAL HEALTH CENTER, INC. )
(D/B/A LAUREL OAKS BEHAVIORAL )

HEALTH CENTER), LAURELWOOD )
ASSOCIATES TRUST, LAURELWOOD )
ASSOCIATES, INC., LEBANON )
HOSPITAL PARTNERS, LLC, LIBERTY )
POINT BEHAVIORAL HEALTHCARE, LLC )
(D/B/A LIBERTY POINT BEHAVIORAL )
HEALTHCARE), MANATEE MEMORIAL )
HOSPITAL, L.P. (D/B/A MANATEE )
MEMORIAL HOSPITAL AND LAKEWOOD )
RANCH MEDICAL CENTER), MANATEE )
MEMORIAL RECEIVABLES, L.L.C., )
MANATEE PHYSICIAN ALLIANCE, LLC, )
MAVERICK COUNTY CLINICAL SERVICES, )
INC., MCALLEN EDINBURG HEALTH )
CARE NETWORK PHYSICIAN HOSPITAL )
ORGANIZATION, MCALLEN HEART )
HOSPITAL, L.P., MCALLEN HOLDINGS, )
INC., MCALLEN HOSPITALIST GROUP, )
PLLC, MCALLEN HOSPITALS )
RECEIVABLES, L.L.C., MCALLEN )
HOSPITALS, L.P. (D/B/A EDINBURG )
CHILDREN'S HOSPITAL, EDINBURG )
REGIONAL MEDICAL CENTER, MCALLEN )
HEART HOSPITAL, SOUTH TEXAS )
HEALTH SYSTEM, MCALLEN MEDICAL )
CENTER, SOUTH TEXAS BEHAVIORAL )
HEALTH CENTER, EDINBURG REGIONAL )
REHAB CENTER), MCALLEN MEDICAL )
CENTER FOUNDATION, MCALLEN MEDICAL )
CENTER PHYSICIANS, INC., MCALLEN )
MEDICAL CENTER, INC., MENTAL )
HEALTH OUTCOMES, LLC, MERRIDELL )
ACHIEVEMENT CENTER, INC. (D/B/A )
MERIDELL ACHIEVEMENT CENTER), )
MERION BUILDING MANAGEMENT, INC., )
MESILLA VALLEY HOSPITAL, INC., )
MESILLA VALLEY MENTAL HEALTH )
ASSOCIATES, INC., MICHIGAN )
PSYCHIATRIC SERVICES, INC., )
MILLWOOD HOSPITAL, L.P. (D/B/A )
MILLWOOD HOSPITAL), MISSION VISTA )
BEHAVIORAL HEALTH SERVICES, INC., )
NASHVILLE REHAB, LLC, NEURO )
INSTITUTE OF AUSTIN, L.P. (D/B/A )
TEXAS NEUROREBAB CENTER), NEVADA )
PREFERRED PROFESSIONALS, INC., )
NEVADA RADIATION ONCOLOGY )

CENTER-WEST, L.L.C. (D/B/A CANCER )
CARE INSTITUTE OF NEVADA), NORTH )
SPRING BEHAVIORAL HEALTHCARE, INC. )
(D/B/A NORTH SPRING BEHAVIORAL )
HEALTHCARE), NORTHERN INDIANA )
PARTNERS, LLC, NORTHERN NEVADA )
DIAGNOSTIC IMAGING-SPANISH )
SPRINGS, L.L.C., NORTHERN NEVADA )
MEDICAL CENTER VOLUNTEER )
AUXILIARY, NORTHERN NEVADA )
MEDICAL GROUP, LLC, NORTHWEST )
TEXAS HEALTHCARE RECEIVABLES, )
L.L.C., NORTHWEST TEXAS )
HEALTHCARE SYSTEM, INC. (D/B/A )
NORTHWEST TEXAS HEALTHCARE SYSTEM )
AND PAVILION AT NORTHWEST TEXAS )
HEALTHCARE SYSTEM), NORTHWEST )
TEXAS SURGICAL HOSPITAL, L.L.C. )
(D/B/A NORTHWEST TEXAS SURGERY )
CENTER), OAK PLAINS ACADEMY OF )
TENNESSEE, INC. (D/B/A OAK PLAINS )
ACADEMY), OASIS HEALTH SYSTEMS, )
L.L.C., OCALA BEHAVIORAL HEALTH, )
LLC (D/B/A VINES HOSPITAL), )
PALMDALE REGIONAL MEDICAL )
FOUNDATION, PALMETTO BEHAVIORAL )
HEALTH HOLDINGS, LLC, PALMETTO )
BEHAVIORAL HEALTH HOLDINGS, LLC, )
PALMETTO BEHAVIORAL HEALTH )
SOLUTIONS, LLC, PALMETTO )
BEHAVIORAL HEALTH SYSTEM, L.L.C., )
PALMETTO LOWCOUNTRY BEHAVIORAL )
HEALTH, L.L.C. (D/B/A PALMETTO )
LOWCOUNTRY BEHAVIORAL HEALTH), )
PALMETTO PEE DEE BEHAVIORAL )
HEALTH, L.L.C. (D/B/A PALMETTO PEE )
DEE BEHAVIORAL HEALTH), PARK )
HEALTHCARE COMPANY, PEAK )
BEHAVIORAL HEALTH SERVICES, LLC )
(D/B/A PEAK BEHAVIORAL HEALTH )
SERVICES), PENDLETON METHODIST )
HOSPITAL, L.L.C., PENNSYLVANIA )
CLINICAL SCHOOLS, INC. (D/B/A )
PENNSYLVANIA CLINICAL SCHOOLS), )
PLAZA SURGERY CENTER, LIMITED )
PARTNERSHIP, PPS COURTS SERVICES, )
L.L.C., PREMIER BEHAVIORAL )

SOLUTIONS OF FLORIDA, INC. (D/B/A )
MANATEE PALMS YOUTH SERVICES AND )
MANATEE PALMS GROUP HOMES), )
PREMIER BEHAVIORAL SOLUTIONS, )
INC., PREPARATORY SCHOOL AT THE )
NATIONAL DEAF ACADEMY, INC., PRIDE )
INSTITUTE, INC. (D/B/A PRIDE )
INSTITUTE), PROFESSIONAL PROBATION )
SERVICES, INC., PROFESSIONAL )
SURGERY CORPORATION OF ARKANSAS, )
PROVIDENCE ASC MANAGEMENT, L.L.C., )
PROVO CANYON SCHOOL, INC., PSI )
SURETY, INC., PSJ ACQUISITION, LLC )
(D/B/A PRAIRIE ST. JOHN'S), )
PSYCHIATRIC MANAGEMENT RESOURCES, )
INC., PSYCHIATRIC SOLUTIONS )
HOSPITALS, LLC, PSYCHIATRIC )
SOLUTIONS OF VIRGINIA, INC. (D/B/A )
JEFFERSON TRAIL TREATMENT CENTER )
FOR CHILDREN), PSYCHIATRIC )
SOLUTIONS, INC., PSYCHMANAGEMENT )
GROUP, INC., RADIATION ONCOLOGY )
CENTER OF AIKEN, LLC (CANCER )
INSTITUTE OF CAROLINA), RAMSAY )
MANAGED CARE, LLC, RAMSAY YOUTH )
SERVICES OF GEORGIA, INC. (D/B/A )
MACON BEHAVIORAL HEALTH SYSTEM), )
RAMSAY YOUTH SERVICES PUERTO RICO )
INC., RANCHO SPRINGS RECEIVABLES, )
L.L.C., RED ROCK BEHAVIORAL )
HEALTH LLC (D/B/A RED ROCK )
HOSPITAL), RED ROCK SOLUTIONS, )
LLC, RELATIONAL THERAPY CLINIC, )
INC., RIDGE OUTPATIENT COUNSELING, )
L.L.C., RIVER CREST HOSPITAL, INC. )
(D/B/A RIVER CREST HOSPITAL), )
RIVER OAKS, INC. (D/B/A RIVER OAKS )
HOSPITAL), RIVEREDGE HOSPITAL )
HOLDINGS, INC., RIVEREDGE )
HOSPITAL, INC. (D/B/A RIVEREDGE )
HOSPITAL), RIVEREDGE REAL ESTATE, )
INC., ROCKFORD ACQUISITION SUB, )
INC. (D/B/A ROCK RIVER ACADEMY), )
ROLLING HILLS HOSPITAL, LLC )
(D/B/A ROLLING HILLS HOSPITAL), )
SAMSON PROPERTIES, LLC, SERVICIOS )
CONDUCTUALES DEL CARIBE, INC., )

11

SHADOW MOUNTAIN BEHAVIORAL HEALTH )
SYSTEM, LLC (D/B/A SHADOW MOUNTAIN )
BEHAVIORAL HEALTH SYSTEM), )
SHC-KPH, LP (D/B/A KINGWOOD PINES )
HOSPITAL), SOMERSET, INCORPORATED )
(D/B/A SOMERSET EDUCATIONAL )
SERVICES), SOUTH KING AMBULATORY )
SERVICES, LLC, SOUTHEASTERN )
HOSPITAL CORPORATION, SOUTHSIDE )
IMAGING CENTER, LLC, SOUTHWEST )
NEUROSCIENCE PAIN CENTER, LLP, )
SOUTHWEST OUTPATIENT IMAGING )
CENTER, LLC, SP BEHAVIORAL, LLC )
(D/B/A SANDY PINES HOSPITAL), )
SPARKS FAMILY HOSPITAL )
RECEIVABLES, L.L.C., SPARKS FAMILY )
HOSPITAL, INC. (D/B/A NORTHERN )
NEVADA MEDICAL CENTER), )
SPRINGFIELD HOSPITAL, INC. )
(D/B/A LINCOLN PRAIRIE BEHAVIORAL )
HEALTH CENTER), ST. LOUIS )
BEHAVIORAL MEDICINE INSTITUTE, )
INC. (D/B/A ST. LOUIS BEHAVIORAL )
MEDICINE INSTITUTE), ST. MARY'S )
PHYSICIAN ASSOCIATES, L.L.C., )
STONINGTON BEHAVIORAL HEALTH, INC. )
(D/B/A STONINGTON INSTITUTE), )
SUMMERLIN HOSPITAL MEDICAL CENTER )
LLC (D/B/A SUMMERLIN HOSPITAL )
MEDICAL CENTER), SUMMERLIN )
HOSPITAL MEDICAL CENTER, L.P., )
SUMMERLIN HOSPITAL RECEIVABLES, )
L.L.C., SUMMIT OAKS HOSPITAL, INC. )
(D/B/A SUMMIT OAKS HOSPITAL), )
SUNSTONE BEHAVIORAL HEALTH, LLC, )
SURGERY CENTER AT CENTENNIAL )
HILLS, L.L.C., SURGERY CENTER AT )
WELLINGTON, L.L.C., SURGERY )
CENTER OF NEW ORLEANS EAST, )
L.L.C., SURGERY CENTER OF THE )
TEMECULA VALLEY, L.L.C., SURGERY )
CENTER PROPERTY, L.L.C., TBD )
ACQUISITION, LLC (D/B/A BROOK )
HOSPITAL-DUPONT), TBJ BEHAVIORAL )
CENTER, LLC (D/B/A RIVER POINT )
BEHAVIORAL HEALTH), TENNESSEE )
CLINICAL SCHOOLS, LLC (D/B/A )

HERMITAGE HALL), TEXAS CYPRESS )
CREEK HOSPITAL, L.P. (D/B/A )
CYPRESS CREEK HOSPITAL), TEXAS )
HOSPITAL HOLDINGS, INC., TEXAS )
HOSPITAL HOLDINGS, LLC, TEXAS )
LAUREL RIDGE HOSPITAL, L.P. )
(D/B/A LAUREL RIDGE TREATMENT )
CENTER), TEXAS OAKS PSYCHIATRIC )
HOSPITAL, L.P., TEXAS SAN MARCOS )
TREATMENT CENTER, L.P. (D/B/A SAN )
MARCOS TREATMENT CENTER), TEXAS )
WEST OAKS HOSPITAL, L.P. (D/B/A )
WEST OAKS HOSPITAL), TEXOMA )
HEALTHCARE RECEIVABLES, L.L.C., )
TEXOMACARE, THE ARBOUR, INC. )
(D/B/A ARBOUR HOSPITAL), THE )
BRIDGEWAY, INC. (D/B/A BRIDGEWAY), )
THE CHARTER SCHOOL AT THE NATIONAL )
DEAF ACADEMY, INC., THE COUNSELING )
CENTER OF MIDDLE TENNESSEE, INC., )
THE FRIENDS OF WELLINGTON REGIONAL )
MEDICAL CENTER, INC., THE NATIONAL )
DEAF ACADEMY, LLC (D/B/A NATIONAL )
DEAF ACADEMY), THE PAVILION )
FOUNDATION (D/B/A PAVILION )
BEHAVIORAL HEALTH SYSTEM), THE )
PINES RESIDENTIAL TREATMENT )
CENTER, INC. (D/B/A PINES )
RESIDENTIAL TREATMENT CENTER), )
THERAPEUTIC SCHOOL SERVICES, )
L.L.C., THREE RIVERS BEHAVIORAL )
HEALTH, LLC (D/B/A THREE RIVERS )
BEHAVIORAL HEALTH), THREE RIVERS )
HEALTHCARE GROUP, LLC, THREE )
RIVERS RESIDENTIAL )
TREATMENT/MIDLANDS CAMPUS, INC. )
(D/B/A THREE RIVERS RESIDENTIAL )
TREATMENT/MIDLANDS CAMPUS), THREE )
RIVERS SPE HOLDING, LLC, THREE )
RIVERS SPE MANAGER, INC., THREE )
RIVERS SPE, LLC, TOLEDO HOLDING )
CO., LLC, TRANSITIONAL CARE )
VENTURES, INC., TUCSON HEALTH )
SYSTEMS, INC., TURNING POINT CARE )
CENTER, INC. (D/B/A TURNING POINT )
CARE CENTER), TWO RIVERS )
PSYCHIATRIC HOSPITAL, INC. (D/B/A )

TWO RIVERS PSYCHIATRIC HOSPITAL, )
UHS ADVISORY, INC., UHS BUILDING )
SOLUTIONS, INC., UHS CHILDREN )
SERVICES, INC., UHS FRONT ROYAL, )
L.L.C., UHS GOOD SAMARITAN, L.L.C. )
(D/B/A GOOD SAMARITAN COUNSELING )
CENTER), UHS HOLDING COMPANY, )
INC., UHS INTERNATIONAL, INC., )
UHS KENTUCKY HOLDINGS, L.L.C., UHS )
MIDWEST CENTER FOR YOUTH AND )
FAMILIES, LLC (D/B/A MIDWEST )
CENTER FOR YOUTH AND FAMILIES), )
UHS OKLAHOMA CITY LLC (D/B/A CEDAR )
RIDGE HOSPITAL AND CEDAR RIDGE )
RESIDENTIAL TREATMENT CENTER), UHS )
RECEIVABLES CORP., UHS RECOVERY )
FOUNDATION, INC. (D/B/A KEYSTONE )
CENTER), UHS SAHARA, INC. (D/B/A )
SPRING MOUNTAIN SAHARA), UHS )
SURGICAL HOSPITAL OF TEXOMA, LLC, )
UHS OF ANCHOR, L.P. (D/B/A ANCHOR )
HOSPITAL, CRESCENT PINES HOSPITAL )
AND SOUTHERN CRESCENT BEHAVIORAL )
HEALTH SYSTEM), UHS OF BARSTOW, )
L.L.C., UHS OF BENTON DAY SCHOOL )
AND TREATMENT PROGRAM, INC., UHS )
OF BENTON, INC. (D/B/A RIVENDELL )
BEHAVIORAL HEALTH SERVICES OF )
ARKANSAS), UHS OF BOWLING GREEN, )
LLC (D/B/A RIVENDELL BEHAVIORAL )
HEALTH SERVICES OF KENTUCKY), UHS )
OF CENTENNIAL PEAKS, LLC (D/B/A )
CENTENNIAL PEAKS HOSPITAL), UHS OF )
COLORADO, L.L.C., UHS OF )
CORNERSTONE HOLDINGS, INC., UHS OF )
CORNERSTONE, INC., UHS OF D.C., )
INC., UHS OF DELAWARE, INC., UHS )
OF DENVER, INC. (D/B/A HIGHLANDS )
BEHAVIORAL HEALTH SYSTEM), UHS OF )
DOVER, L.L.C. (D/B/A DOVER )
BEHAVIORAL HEALTH SYSTEM), UHS OF )
DOYLESTOWN, L.L.C. (D/B/A )
FOUNDATIONS BEHAVIORAL HEALTH )
SYSTEM), UHS OF EAGLE PASS, INC., )
UHS OF FAIRMOUNT, INC. (D/B/A )
FAIRMOUNT BEHAVIORAL HEALTH )
SYSTEM), UHS OF FULLER, INC. )

(D/B/A ARBOUR- FULLER HOSPITAL), )
UHS OF GEORGIA HOLDINGS, INC., )
UHS OF GEORGIA, INC., UHS OF )
GREENVILLE, INC. (D/B/A CAROLINA )
CENTER FOR BEHAVIORAL HEALTH), UHS )
OF HAMPTON LEARNING CENTER, INC. )
(D/B/A HAMPTON ACADEMY), UHS OF )
HAMPTON, INC. (D/B/A HAMPTON )
BEHAVIORAL HEALTH CENTER), UHS OF )
HARTGROVE, INC. (D/B/A HARTGROVE )
HOSPITAL), UHS OF INDIANA, INC., )
UHS OF KOOTENAI RIVER, INC. (D/B/A )
BOULDER CREEK ACADEMY AND )
NORTHWEST ACADEMY), UHS OF )
LAKESIDE, LLC (D/B/A LAKESIDE )
BEHAVIORAL HEALTH SYSTEM), UHS OF )
LAUREL HEIGHTS, L.P. (D/B/A LAUREL )
HEIGHTS HOSPITAL), UHS OF NEW )
ORLEANS, INC., UHS OF NO. NEVADA, )
LLC, UHS OF ODESSA, INC., UHS OF )
OKLAHOMA RECEIVABLES, L.L.C., UHS )
OF OKLAHOMA, INC. (D/B/A ST. )
MARY'S REGIONAL MEDICAL CENTER), )
UHS OF PARKWOOD, INC. (D/B/A )
PARKWOOD BEHAVIORAL HEALTH )
SYSTEM), UHS OF PENNSYLVANIA, INC. )
(D/B/A CLARION PSYCHIATRIC CENTER, )
HORSHAM CLINIC, MEADOWS )
PSYCHIATRIC CENTER/UNIVERSAL )
COMMUNITY BEHAVIORAL HEALTH AND )
ROXBURY TREATMENT CENTER), UHS OF )
PROVO CANYON, INC. (D/B/A PROVO )
CANYON SCHOOL AND PROVO CANYON )
SCHOOL- SPRINGVILLE CAMPUS), UHS )
OF PUERTO RICO, INC. (D/B/A )
HOSPITAL SAN JUAN CAPESTRANO), )
UHS OF RIDGE, LLC (D/B/A RIDGE )
BEHAVIORAL HEALTH SYSTEM), UHS OF )
RIVER PARISHES, INC., UHS OF )
ROCKFORD, LLC (D/B/A ROCKFORD )
CENTER), UHS OF SALT LAKE CITY, )
L.L.C. (D/B/A COTTONWOOD TREATMENT )
CENTER), UHS OF SAVANNAH, L.L.C. )
(D/B/A COASTAL HARBOR TREATMENT )
CENTER AND COASTAL HARBOR HEALTH )
SYSTEM), UHS OF SPRING MOUNTAIN, )
INC. (D/B/A SPRING MOUNTAIN )

TREATMENT CENTER), UHS OF )
SPRINGWOODS, L.L.C. (D/B/A )
SPRINGWOODS BEHAVIORAL HEALTH), )
UHS OF SUMMITRIDGE, L.L.C. (D/B/A )
SUMMITRIDGE HOSPITAL), UHS OF )
SUTTON, INC. (D/B/A KING GEORGE )
SCHOOL), UHS OF TRC, INC., UHS OF )
TALBOT, L.P. (D/B/A TALBOT )
RECOVERY CAMPUS AND TALBOT AT )
DUNWOODY), UHS OF TEXOMA, INC. )
(D/B/A TEXOMA MEDICAL CENTER AND )
TMC BEHAVIORAL HEALTH CENTER), UHS )
OF TIMBERLAWN, INC. (D/B/A )
TIMBERLAWN MENTAL HEALTH SYSTEM), )
UHS OF TIMPANOGOS, INC. (D/B/A )
CENTER FOR CHANGE), UHS OF )
WASHINGTON, INC., UHS OF WESTWOOD )
PEMBROKE, INC. (D/B/A PEMBROKE )
HOSPITAL AND WESTWOOD LODGE )
HOSPITAL), UHS OF WYOMING, INC. )
(D/B/A WYOMING BEHAVIORAL )
INSTITUTE), UHS-CORONA )
RECEIVABLES, L.L.C., UHS-CORONA, )
INC. (D/B/A CORONA REGIONAL )
MEDICAL CENTER), UHS-LAKELAND )
MEDICAL CENTER, L.L.C., UHSD, )
L.L.C., UHSF, L.L.C., UHSL, )
L.L.C., UNITED HEALTHCARE OF )
HARDIN, INC. (D/B/A LINCOLN TRAIL )
HOSPITAL AND LINCOLN TRAIL )
BEHAVIORAL HEALTH SYSTEM), )
UNIVERSAL COMMUNITY BEHAVIORAL )
HEALTH, INC., UNIVERSAL HMO, INC., )
UNIVERSAL HEALTH FINANCE, L.L.C., )
UNIVERSAL HEALTH NETWORK, INC., )
UNIVERSAL HEALTH RECOVERY CENTERS, )
INC., UNIVERSAL HEALTH SERVICES )
FOUNDATION, UNIVERSAL HEALTH )
SERVICES OF CEDAR HILL, INC., )
UNIVERSAL HEALTH SERVICES OF )
PALMDALE, INC., UNIVERSAL HEALTH )
SERVICES OF RANCHO SPRINGS, INC. )
(D/B/A SOUTHWEST HEALTHCARE )
SYSTEM, INLAND VALLEY MEDICAL )
CENTER AND RANCHO SPRINGS MEDICAL )
CENTER), UNIVERSAL TREATMENT )
CENTERS, INC., UNIVERSITY )

16

BEHAVIORAL, LLC (D/B/A UNIVERSITY )
BEHAVIORAL CENTER), VALLE VISTA )
HOSPITAL PARTNERS, LLC, VALLE )
VISTA, LLC (D/B/A VALLE VISTA )
HEALTH SYSTEM), VALLEY HEALTH )
SYSTEM LLC (D/B/A CENTENNIAL )
HILLS HOSPITAL MEDICAL CENTER, )
DESERT SPRINGS HOSPITAL, SPRING )
VALLEY HOSPITAL MEDICAL CENTER AND )
VALLEY HOSPITAL MEDICAL CENTER), )
VALLEY HEALTH SYSTEM RECEIVABLES, )
L.L.C., VALLEY HOSPITAL MEDICAL )
CENTER, INC., VALLEY SURGERY )
CENTER, L.P., VENTURES HEALTHCARE )
OF GAINESVILLE, INC., VICTORIA )
REGIONAL MEDICAL CENTER, INC., )
VIRGIN ISLANDS BEHAVIORAL )
SERVICES, INC. (D/B/A VIRGIN )
ISLANDS BEHAVIORAL SERVICES), )
VISTA DIAGNOSTIC CENTER, L.L.C., )
WEKIVA SPRINGS CENTER, LLC (D/B/A )
WEKIVA SPRINGS CENTER), WELLINGTON )
PHYSICIAN ALLIANCES, INC., )
WELLINGTON RADIATION ONCOLOGY )
GROUP, LLC, WELLINGTON REGIONAL )
DIAGNOSTIC CENTER, L.L.C., )
WELLINGTON REGIONAL HEALTH & )
EDUCATION FOUNDATION, INC., )
WELLINGTON REGIONAL MEDICAL )
CENTER, INCORPORATED (D/B/A )
WELLINGTON REGIONAL MEDICAL )
CENTER), WELLINGTON REGIONAL )
RECEIVABLES, L.L.C., WELLINGTON )
REGIONAL URGENT CARE CENTER, )
L.L.C., WELLSTONE HOLDINGS, INC., )
WELLSTONE REGIONAL HOSPITAL )
ACQUISITION, LLC (D/B/A WELLSTONE )
REGIONAL HOSPITAL), WEST OAKS )
REAL ESTATE, L.P., WILLOW SPRINGS, )
LLC (D/B/A WILLOW SPRINGS CENTER), )
WINDMOOR HEALTHCARE INC. (D/B/A )
WINDMOOR HEALTHCARE), WINDMOOR )
HEALTHCARE OF PINELLAS PARK, INC., )
ZEUS ENDEAVORS, LLC, AND ALL )
HOSPITALS, BEHAVIORAL HEALTHCARE )
FACILITIES, AND ALL OTHER )
HEALTHCARE FACILITIES OWNED, )

OPERATED OR MANAGED BY THEM SINCE )
1978, MATTHEW W. CROUCH, TOMMIE   )
RICHARDSON, MD, AND JOHN DOES 1    )
THROUGH 1000

      Defendants.

---

## PLAINTIFF'S FOURTH AMENDED COMPLAINT
## AND DEMAND FOR JURY TRIAL

### I. INTRODUCTION

1. JAMES HUGH POTTS II ("Relator") brings this action on behalf of the UNITED STATES OF AMERICA against UHS OF PEACHFORD, UHS OF DELAWARE, INC., and UNIVERSAL HEALTH SERVICES, INC., and all other behavioral health care facilities, acute care hospitals and other healthcare facilities that are subsidiaries of UNIVERSAL HEALTH SERVICES, INC., Matthew W. Crouch, and Tommie Richardson, MD, and John Does 1 through 1000 (hereafter "Defendants"). Relator sues Defendants for treble damages and civil penalties arising from the Defendants' conduct in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"). The violations arise out of requests for payment by Medicare, Medicaid, CHAMPUS and other government agencies and programs (hereinafter, collectively the "Government Healthcare Programs") based on false claims.

2. The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $10,000 for each such claim submitted or paid, plus three times the amount of damages sustained by the Government.  Liability attaches both when a defendant knowingly seeks payment that is unwarranted from the Government and when false records or statements are knowingly created or caused to be used to conceal, avoid or decrease an obligation to pay or transmit money to the Government.  The FCA is the government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. See S. Rep. No. 345, 99 Cong., 2nd Sess. At 2 (1986) reprinted in 1986 U.S.C.C.A.N. 5266.  The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring an action for himself ("the relator") and for the Government and to share in any recovery.  The Complaint is filed under seal for 60 days (without service on the defendants during that period) to enable the Government: (a) to conduct its own investigation without the defendants' knowledge, and (b) to determine whether to join the action.

3. Based on those provisions, plaintiff/relator seeks to recover damages and civil penalties arising from defendants' presentation of false records, claims and statements to the Unites States Government and its agents in connection with defendants' claims for reimbursement for services provided to patients under the Medicare, Medicaid and CHAMPUS programs.

4. Plaintiff/relator seeks further relief for defendants' violations of the Social Security Act § 1320a-7b(f) ("SSA") and the Health Insurance Portability and Accountability Act. ("HIPAA").

5. Plaintiff/relator also brings this action on behalf of: Georgia (pursuant to the Georgia State False Medicaid Claims Act, GA. CODE ANN. § 49-4-168 *et. seq.*) California False Claims Act, CA. CODE ANN. §§ 12650-1265; Colorado Medical Assistance Act, Colo. Rev. Stat. §§ 25.5-4-304 to 25.5-4-310; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201-1209; Florida False Claims Act, Fla. Stat. Ann. §§ 68.081-68.092; Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1-8; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 438; Massachusetts False Claims Act,

Mass. Gen. Laws Ann. Ch. 12, §§ 5-50, 5B; Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601-400.612; Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.010-357.250; New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 through 2A:32C-15; New Mexico Medicaid False Claims Act, §§ 27-14-1 to 27-14-15; New Mexico Fraud Against Taxpayers Act, §§ 44-9-1 to 44-9-14; Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63. §§ 5053-5053.7; Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 to 4-18-108; Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001 to 36.132; and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 to 8.01-216.19.

## II. **JURISDICTION AND VENUE**

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 et seq. and 3730.

7. The acts proscribed by 31 U.S.C. § 3729 et seq. and complained of herein occurred in part in the Northern District of Georgia, and Defendants, UNIVERSAL HEALTH

SERVICES, INC., UHS OF PEACHFORD, L.P., Matthew W. Crouch, and Tommie Richardson, MD, among others, do business in the Northern District of Georgia.  Therefore, this Court has jurisdiction over this case and all Defendants pursuant to 31 U.S.C. § 3732(a), as well as under 28 U.S.C. § 1345. This Court has pendent jurisdiction over this case for the claims brought on behalf of the States (referenced in paragraph 5) pursuant to 31 U.S.C. § 3732(b), inasmuch as recovery is sought on behalf of said state which arises from the same transactions and occurrences as the claim brought on behalf of the United States.

8. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts are proscribed by 31 U.S.C. § 3729 et seq. and also proper pursuant to U.S.C. § 1391(b) because the claims that this Complaint describes arose in this district.  Further, some of the Defendants and the corporate parent of all of the Defendants do business in this District.

### III. **PARTIES**

9. Plaintiff and Relator, James Hugh Potts II, is a citizen and resident of Georgia.  Mr. Potts resides at 1348 Ponce de Leon Ave. NE, Atlanta, Georgia 30306.  Mr. Potts is a trial lawyer and owns James Hugh Potts II, L.L.C. in Atlanta, Georgia.  Mr. Potts brings this action for

violations of 31 U.S.C. §§ 3729 et seq. on behalf of himself and the United States Government pursuant to § 3730(b)(1) *et. seq.* Mr. Potts has personal knowledge of the health quality fraud and false records, statements and claims presented to the Government by and for the defendants named herein. Mr. Potts discovered a systemic fraudulent practice by defendants. Mr. Potts further brings this action for violations of SSA, HIPAA and the following state false claims acts: Georgia State False Medicaid Claims Act, GA. CODE ANN. § 49-4-168; California False Claims Act, CA. CODE ANN. §§ 12650-1265; Colorado Medical Assistance Act, Colo. Rev. Stat. §§ 25.5-4-304 to 25.5-4-310; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201-1209; Florida False Claims Act, Fla. Stat. Ann. §§ 68.081-68.092; Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1-8; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 438; Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12, §§ 5-50, 5B; Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601-400.612; Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.010-

357.250; New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 through 2A:32C-15; New Mexico Medicaid False Claims Act, §§ 27-14-1 to 27-14-15; New Mexico Fraud Against Taxpayers Act, §§ 44-9-1 to 44-9-14; Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63. §§ 5053-5053.7; Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 to 4-18-108; Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001 to 36.132; and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 to 8.01-216.19.

10. Defendants. Tommie Richardson, the Clinical Director, Matthew W. Crouch, CEO of UHS of Peachford, L.P., UHS of Peachford, L.P. (d/b/a Peachford Behavioral Health System of Atlanta located at 2151 Peachford Rd., Atlanta, Georgia 30338-6534), which is incorporated in Delaware and is a limited partnership subsidiary of Universal Health Services, Inc., a Delaware Corporation with its principal executive offices at Universal Corporate Center, 367 South Gulph Road, P.O. Box 61558, King of Prussia, PA 19406. UHS of Peachford L.P. can be served through its agent for service of process, Matthew W. Crouch, CEO. UHS of Delaware, Inc., Universal Health Services, Inc. and UHS of Peachford, L.P. can be served through their agent for service of process, Steve G. Filton, Senior VP and CFO. Dr.

Tommie Richardson can be served at 4015 South Cobb Dr., Suite #115, Atlanta, Georgia 30080.

11.    Defendant UNIVERSAL HEALTH SERVICES, INC. (hereinafter "UNIVERSAL") is a healthcare management company engaged in the business of owning and operating behavioral health facilities, acute care hospitals, ambulatory surgery and radiation centers nationwide. UNIVERSAL is incorporated in the State of Delaware, its corporate headquarters are located in King of Prussia, Pennsylvania and it does business throughout the United States.    Excluding Tommie Richardson, the Clinical Director, and Matthew W. Crouch, CEO of UHS of Peachford, L.P., UNIVERSAL is the parent company to all other defendants named herein.    An allegation against any Defendant herein is intended to include UNIVERSAL as a responsible party, inasmuch as UNIVERSAL is the parent company integrally involved in each of the Defendant hospital's operations.

12.    Defendant UHS OF DELAWARE, INC. d/b/a Universal Health Services of Delaware, Inc., is a wholly-owned subsidiary of UNIVERSAL.    It is a Delaware corporation with its corporate headquarters located in King of Prussia, Pennsylvania and does business throughout the United States.

13.    All  of  UNIVERSAL's  subsidiaries  are  intended defendants  with  respect  to  this  complaint.  (Exhibit  12, pages 149 to 179, and 31 to 36).

## IV. FEDERAL HEALTHCARE PROGRAMS

14.    In  1965,  Congress  enacted  Title  XVIII  of  the Social  Security  Act,  known  as  the  Medicare  Program,  to  pay for  the  costs  of  certain  healthcare  services.   Entitlement to  Medicare  is  based  on  age,  disability  or  affliction  with certain diseases. See 42 U.S.C. § 1395 to 1395ccc.   There are  two  general  components  to  the  Medicare  program,  Part  A and Part B.

15.    The  Medicaid  program,  as  enacted  under  Title  XIX of  the  Social  Security  Act  of  1965,  42  U.S.C.  §  1396,  et seq.,  is  a  system  of  medical  assistance  for  indigent individuals.    Though  federally  created,  the  Medicaid program  is  a  joint  federal-state  program  in  which  the United  States  provides  a  significant  share  of  the  funding for the program.

16.    TRICARE  Management  Activity,  formerly  known  as CHAMPUS,  is  a  program  of  the  Department  of  Defense  that helps  pay  for  covered  civilian  health  care  obtained  by Uniformed  Services  beneficiaries,  including  retirees,  their dependents  and  dependers  of  active-duty  personnel.   10 U.S.C.  §§  1079,  1086;  32  C.F.R.  Part  199.    TriCare

contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by Defendants.

## V. **ALLEGATIONS**

17.    Defendants are all health care service providers or health care provider chains that participate in federally funded health care programs including Medicare, Medicaid and CHAMPUS.

### HHS Action and Defendants' Repeated Non-Compliance:

18.    On the morning of 21 July 2000 a 48 year-old detoxification patient on the Stabilization Unit at UHS Peachford, L.P. was found dead and the Georgia Department of Human Resources ("DHRS") concluded, a "current problem with physician order patient reassessments per detoxification protocol." (Exhibit 1).

19.    On 14 May 2001 the United States Department of Health and Human Services ("HHS") acting in the public interest to ensure minimum standards of hospital safety for Medicare services notifies Peachford Hospital's CEO, Matt Crouch, regarding **2 surveys** in both March and April of 2001. The letter reads in pertinent part as follows: **"the conditions at your hospital pose an immediate and serious**

threat to the health and safety of patients." (Exhibits 2 and 2a).

20.     HHS further states that Medicare will no longer pay Peachford for patients admitted after 6 June 2001 unless the deficiencies are corrected. (Exhibit 2).

21.     The following month on 20 June 2001, the Georgia Department of Human Resources **(DHR)** also notifies Peachford Hospital regarding its own hospital survey in June 2001 stating, "There were deficiencies noted during the survey and these will require your attention." Included in the deficiencies, **"Nursing   Services   failed   to   ensure appropriate   evaluation,   planning,   monitoring   and supervision of patient care."** (Exhibits 3 and 3a).

22.     Matthew   Crouch,   Peachford's   CEO,   in   a specifically tailored plan of corrective action agrees to complete   regular   physical   assessments   encapsulated   in   a **"Narcotic   Withdrawal   Scale"** ("**NWS**") to ensure a minimum level of appropriate monitoring of all "Addiction Services" inpatients so that Peachford can meet the minimum standards of   safety   and   keep   its   Medicare   funding   and   hospital permit. (Exhibits 4 and 5).

23.     Matthew   Crouch   agreed   that   he   intended   the Narcotic Withdrawal Scale to be a "***Complete and permanent***

***corrective action***." (Exhibit 17, Crouch Deposition, page 19, lines 17-21).

24.    Matthew Crouch also agreed that the Narcotic withdrawal scale was **not completed** in a case referred to in 12 July 2004. (Exhibit 18, Crouch Deposition, page 176, lines 12-16).

## Defendants Kill Patient

25.    Centers for Medicare and Medicaid Services ("CMS") covers withdrawal treatment for narcotic addictions and detoxification including the drugs provided in connection with this treatment that are "***provided by the physician directly or under his personal supervision*** and if they are ***reasonable and necessary***." See Medicare National Coverage Determinations Manual, Chapter 130.6 Treatment of Drug Abuse (Chemical Dependency)(Rev. 1, 10-03-03) CIM 35-22.2, and Chapter 130.7 Withdrawal Treatments for Addiction (Rev. 1, 10-03-03) CIM 35-42. (Emphasis added).

26.    In 2002, the patient moved to Atlanta, Georgia to be closer to her only child.

27.    The patient had stopped taking MS Contin and Morphine prescribed for joint pain 10 days prior to her admission to Peachford.

28.    The patient presented to an emergency room with knee pain, the psychiatric hospital sent an employee with

no medical or nursing training to examine the patient in the emergency room and testified that she diagnosed the patient with severe opioid withdrawal and required medically monitored detoxification.

29.     On 28 July 2002, the patient, a Medicare patient, then presents to UHS Peachford hospital ("Peachford") with pain management issues from a failed total knee replacement. (Exhibit 6).

30.     Without being examined by a physician she is admitted by a social worker to the inpatient "Addiction Service" under the **clinical direction** of **Dr. Tommie Richardson.** The social worker diagnoses the patient with mild prescription morphine withdrawal. (Exhibit 6).

31.     The on call physician, relying on the social worker's assessment, places the patient on the automatic medication and monitoring protocol of the inpatient "Addiction Service," which includes regular dosing of methadone and other powerful drugs but also incorporates the regular and careful staff assessments encapsulated in the Narcotic Withdrawal Scale that was mandated for Peachford and that CEO Crouch had promised to do. (Exhibits 7, 8, and 9).

32.     Within the 72 hours of her admission, the patient received and Medicare was billed and paid for the following

medications: Albuterol sulfate, Clonazepam, Clonidine HCl, Losartan Potassium, Dicyclomine HCl, Fluconazole, Doxepin HCl, Estradiol, Folic Acid, Hydroxychloroquine Sulfate, Ibuprofen, Methadone HCl, Amlodipine Besylate, Insulin, Prednisone, Promethazine, Quetiapine Fumarate, Magnesium Chloride, Thiamine HCl, Vitamin B Complex, and Sertraline HCl. (Exhibit 13, Peachford Hospital Charges).

33.    Medicare paid $2,917.43 to Peachford on 07 August 2002 for the patient's care, an additional $397.00 on 26 August 2002 and $812.00 via United Healthcare on 26 September 2002. (Exhibit 13, Peachford Hospital Charges).

34.    Three days after her admission, on 31 July 2002, the patient is found dead in her hospital bed – *cold and blue*, killed by the relentless stacked administration of several sedating and cardio-toxic drugs **without a single post medication Narcotic Withdrawal Scale assessment ever having been completed.** (Exhibit 10).

35.    The patient's autopsy revealed that the patient died from an overdose of narcotic medications, **"Combined Toxic Effects of Methadone and Hydroxychoroquine"**, including multiple stacked methadone doses, prescribed by her physician and administered to her by UHS of Peachford, L.P. ("Peachford") hospital personnel. (Exhibit 10).

36.    The narcotics were prescribed according to an automatic protocol by a Peachford Hospital staff physician, despite the patient never undergoing a physical examination by any physician. (Exhibits 6, 7, 8 and 9).

37.    In an *explicit violation* of the terms of Defendants' 'probation', the drugs were administered to her by Peachford hospital personnel who failed to monitor the patient's response by **not completing any of the required regular Narcotic Withdrawal Scales** though they had been federally mandated for this hospital through its arrangement with Medicare. (Exhibits 2, 3, 4 and 5).

38.    Over-sedation with narcotics is a non-lethal condition when properly monitored that occurs daily and ubiquitously in medical care (e.g. anesthesia where with proper monitoring the effects are easily reversible).

39.    The patient was killed from negligent monitoring after, as HHS concluded, " . . . **the conditions at [Peachford] hospital pose an immediate and serious threat to the health and safety of patients, and after DHR worked out a corrective plan to save Peachford's Medicare funding.**" Matt Crouch, CEO, not only acknowledged the issues were valid, but said they were resolved well before The patient was killed.

40. Dr. Tommie Richardson's clinical role in the pateint's monitoring was mandated by law (DHR Reg. 290-9-7.3701-3705). (Exhibits 1 through 5).

41. The patient's protocol driven Admission Orders required Peachford nurses to administer a "Narcotic Withdrawal Scale (**NWS**) upon admission, Q.I.D., and 1 hour after each dose of Clonidine." (Exhibits 5 through 9).

42. Although required 26 times, **not once** was the Narcotic Withdrawal Scale ever completed for the patient; she became dangerously over-sedated, and died.

43. John McKenna, formerly the Director of Nursing at Peachford and currently the CEO of Rockford Center – another Universal subsidiary, testified that a Narcotic Withdrawal Scale is a "***tool to document the nurse's observations***" and "***it would help" to determine whether a patient was already over-sedated***, and ***takes ten minutes or less to complete.*** (Exhibit 14, McKenna deposition 2 December 2004, pages 35 – 36, lines 21-25 and 1-7, 17-18).

44. John McKenna testified that he "believe[d] the intent of that scale [NWS] was completed via the progress notes and flow sheets." (Exhibit 14, page 120, lines 5-7).

45. John McKenna testified that Matt Crouch did not express any concern to him about what the nurses at

Peachford were doing according to the statement of deficiencies. (Exhibit 14, page 100, lines 18-22).

46.     John McKenna testified that he **disagreed** with the **Georgia Office of Regulatory Services'** statement that **"We believe the conditions at your hospital pose an immediate and serious threat to the health and safety of patients."** (Exhibit 14, pages 121-122, lines 21-25 and lines 1-3).

47.     John McKenna testified that Peachford did not set a benchmark standard for compliance with the NWS although Peachford had an explicit agreement to complete NWSs 100% of the time in order to continue participation with and payments from Medicare. (Exhibit 14, pages 178-180).

48.     Years after the patient's death for Defendants' failure to monitor her, the State of Georgia, Office of Regulatory Services **again** reported deficiencies in its survey completed 12 July 2004; specifically, multiple counts of failure to document the Narcotic Withdrawal Scale, where *one Registered Nurse* "revealed that *she did not routinely* fill out the NWSs." (Exhibit 11, pp. 8-11).

49.     At the time of the **12 July 2004** survey, "Peachford Behavioral Health System of Atlanta was not in compliance with Chapter 290-9-7, Rules and Regulations for Hospitals, as the result of complaint investigation #GA00016859." Findings were "*failure of the quality*

34

*management program to adequately identify and address the causes of systems failures related to a patient death.*" (Exhibit 11, p. 1).

50.     The findings of the 12 July 2004 survey also include Defendants' "*failure to provide sufficient nursing staff to assess and address the needs of psychiatric and substance abuse patients and to ensure the maintenance of a safe and therapeutic environment.*" (Crouch Plaintiff's Exhibit 11, p. 2).

### Peachford's Policy/Monitoring Issues Not Limited to NWS

51.     DHR cited Peachford for deficiencies in its survey completed on 11 September 2003.  Specifically, the Risk Manager of Peachford "confirmed that the facility *failed to follow its policy*" regarding a patient's rights to be informed and right to refuse treatment. (Exhibit 19 DHR Fax pages 2 and 3).

52.     DHR cited Peachford for deficiencies in its survey completed October 2004 finding Peachford's "Anesthesia Protocol lacked established standards for monitoring the patient's condition during the administration of general anesthesia", and found "**four of five medical records** (#1, #28, #29, and #30) **lacked documented evidence** that the patient's respiratory (breathing) rate had been monitored during the use of

general anesthesia." **Two of two** in-patient medical records reviewed (#1 and #30) lacked documented evidence that a post-anesthesia evaluation was conducted . . .."(Exhibit 20, DHR Report 10/7/2004, pages 3 and 4).

### Universal's Systemic Health Quality Fraud

53.     Quality fraud or quality control fraud as defined by the U.S. Attorney in 2006 after a spate of prosecutions of 4 hospitals is founded in the theory of fiduciary certification, implied or explicit, to participate in a payment scheme.   Such species of fraud is practiced and directed exclusively by those private for profit fiduciaries charged with self-review of their clinical practices.     Limited safe harbor is afforded at the institutional level on the basis of partnering with the government for policing small-scale quality issues. Opacity of the private for profit fiduciaries' actions is provided under numerous state laws via finality of judgment and immunity from prosecution.   Universal's robo-psychiatry and automaton models have taken their quality control fraud nationwide.   Though the remedies to public endangerment by the Universal model are easily identified and have been repetitively identified and purportedly cleaned up via various compliance agreements, the pattern of quality fraud by Universal's fiduciaries has not been identified and

Universal's fiduciaries hold fast to their quality control fraud business model.

54.   Quality control fraud has been defined by the U.S. Attorney's Office and enforced at the individual institution level.   It is defined by 4 elements of fiduciary conduct.   The cases prosecuted by the OIG have each involved profitable hospital schemes and failure of the fiduciaries to take action to ensure safety that would require ending the particular scheme and making those DRG's less profitable.

55.   The 4 tests of quality control fraud are:

a. **KNOWING CONDUCT BY AN INSTITUTION/GROSS AND SYSTEMIC LEADERSHIP FAILURES** (Notice, warning, and failure to act) One death in the Universal system of robo-psychiatry, for example, might have caused a responsible fiduciary to take notice and examine their systems. **The Universal model ensures multiple deaths in Universal institutions, not limited to behavioral health, but also in patients who, if not admitted to these facilities and subjected to these protocols, would all survive**. This has happened numerous times and will continue under current fraud enforcement levels.

b. **INTENTIONAL ACTS BY INDIVIDUALS** The Universal business scheme of **DRG churning** involves knowing acts of individuals and includes an extremely ambitious expansion of automatic prescriptive power system-wide by **bringing patients in-house to raise acuity levels.** Such an expansion of prescription power would never be tolerated by evidence based medical principles or a circumspect skillful physician. Systematic reduction in monitoring is far more than a mere staffing problem and is exclusively and completely within the control of Universal's fiduciaries.

c. **APPALLING OUTCOMES. As a result of the Defendants' systemic Quality Control Fraud, appalling outcomes have** been highly predictable and manifest as multiple inpatient deaths across the country. Many of these deaths have occurred in otherwise healthy patients who have been wrongly diagnosed and grossly overmedicated without monitoring.

d. **FALSE REPORTING, AND A FAILURE TO REPORT.** Universal Steadfastly files false reports and at

times refuses to report appalling outcomes
altogether.

56. Defendants are engaged in systemic quality
control fraud throughout their acute care and behavior
healthcare facilities. Numerous examples of Defendants'
quality control fraud present in their behavioral
healthcare component are provided below for illustrative
purposes.

57. **Defendants are repeatedly engaged in churning
unnecessarily high acuity inpatient diagnostic related
groupings (DRG)'s for unnecessary psychiatric services that
are in turn neither provided to patients nor are the
patients monitored.** In this process, Defendants also churn
related acuity raising billables, including, but not
limited to, dangerously profiled and potentially lethal
pharmaceuticals, alone and in combination, through
automatic protocols in a form of robo-psychiatry using
system wide protocols. The foundation of the Universal
robo-psychiatry churning models is the knowing and
systematic uncoupling of high acuity DRG's from higher, but
more costly, monitoring levels required by those DRG's to
achieve higher net institutional payments across the board.
It is fundamental to basic public health that these
indicators of high acuity cannot be uncoupled from any

certification of quality for bulk payment purposes or conditions of participation in a government payment scheme, inasmuch as **medicating and monitoring cannot be separated from a public safety perspective.**

58.    Universal has achieved **grossly outsized profits** from its fraudulent robo-psychiatry model, for example, and its built in cost and labor saving systemic weaknesses have become manifest in deaths across this country since the inception of these models.    Rather than correct its systemic fraud, Universal has responded by opening more centers and engaging in system wide quality control fraud expanded to every aspect of its healthcare delivery system.

59.    **There is nothing subtle or particularly complex about the robo-psychiatry churning scheme pioneered by Universal.**    It was accomplished through a ghostwritten standard protocol. To further illustrate, the Defendants' churning method exposes every patient captured by the softest of diagnostic criteria for narcotic dependency, as diagnosed by a non-physician social worker, to massive doses of medications no sane physician would ever prescribe, thus maximizing the acuity level for DRG purposes.    Universal then lowers and elliminates the monitoring level by unqualified staff to one that does not support hospitalization.

60. In a similar non-behavioral healthcare churning scheme, 14 hospitals have paid the U.S. more than $12 million to settle their kyphoplasty churning fraud where they billed Medicare for higher acuity care as inpatient instead of, as appropriate, outpatient care. Available at: http://www.justice.gov/opa/pr/2012/February/12-civ-173.html

61. Universal's churning model has over - at least - the past decade achieved an **enormous windfall** through its cost and labor saving features at the expense of human life. Through its use of robo-psychiatry in just one segment of its enormous healthcare delivery network, **Universal's automated high acuity medication and low or no acuity monitoring levels, has enabled Universal to achieve grossly outsized profits from both government and private payor programs.**

62. **Appalling outcomes have predictably resulted system wide from Universal's robo-psychiatry model and its other automaton churning models, yet the churning remains unabated by Universal.** Rather than fix the public health quality problem by introducing a physician into each medication decision, Universal has taken **zero responsibility** for the deleterious effects of its churning model. Elimination of all dangerous drugs from automatic protocols and restoring high acuity monitoring to those

patients who are being billed for high acuity DRG's, e.g. DRG's which involve regular vital bodily function assessment as a consequence of medications suppressing these bodily functions, will inevitably result in an undesirable reduction in Universal's profit margin but vastly improve safety.

63.    Fiduciaries of Universal have systematically sought to continue their dangerous, albeit profitable, practices by placating the government with purported corrective action plans and corporate compliance agreements at individual facilities, which at least superficially appear to address Universal's robo-psychiatry and other automaton models.    These corporate compliance agreements are **unambiguously disregarded system wide** and in practice have become objects of **derision** by the Universal fiduciaries of the individual institutions.

64.    The growing tension between the Universal model of robo-psychiatry and automaton care and the sanctity of public health championed by government quality advocates is manifested in numerous, meaningless corporate compliance agreements for Universal nationwide.    This tension has caused a newer and even more pernicious innovation in fiduciary conduct whereby the flaws in the corporate model

are **concealed through quality control fraud** or quality fraud by any means available system wide.

65. **Universal's DRG churning fraud** involves sophisticated exploitation and abuse of trust afforded fiduciaries of Universal by government through numerous apparent safe-harbors ostensibly in the public interest. Rather than abandon or reengineer their innovative robo-psychiatry and automaton models, Universal's fiduciaries sought to minimize its lethal effect. **Universal's fraud scheme involves false reporting and failing to report ranging from misrepresenting and providing general disinformation about quality and safety on an enterprise level to fraudulent use of the peer review processes** - with the programmed lack of evidentiary safeguards traditionally used to evaluate medical evidence.

66. Universal's programmed lack of internal evidentiary safeguards can be easily seen in the various bylaws of its institutions that favor unfounded and superfluous explanations and misrepresentations of basic medical facts in preference to the discernment of any factual bases for their patients' peril. The factual bases would disclose the inherent fraud in Universal's robo-psychiatry and automaton models. Universal's fiduciaries make ample use of state and federal peer review protections

to wrongfully withhold **any** evidence of fraud and thereby escape both personal liability in Universal's fiduciary role and financial liability for Universal's inherent fraud.

67.    In addition to **Universal's corporate innovation of converting low acuity or no acuity patient conditions into high acuity DRG's and the practice of robo-psychiatry and automaton medicine, Universal's fiduciaries pull out all of the stops in yet another pernicious Universal corporate innovation.**

68.    System-wide robo-psychiatry or practicing automaton protocol medicine without substantial physician input and using medication delivery protocols of dangerous drugs for Universal's preferred DRG's for payment allows particularly vulnerable populations who are recipients of government and private payment schemes to be exploited.

69.    The DRG's have always been designed and conceived by payors to be a direct function of, and directly proportional to, the level of individual patient monitoring and not an automated process. **Universal's targets** are **vulnerable** and relatively **defenseless** populations, including but not limited to, children and the elderly.

70.    Among the highest value DRG's are those involving **inpatient medication administration and inpatient**

**detoxification treatment programs whereby any patient who has ever been prescribed a narcotic medication and has a third-party payor is swept into this profit-before-safety churning scheme.** Pursuant to the deference afforded the higher level of acuity for these inpatient DRG's, **patients are administered lethal and potentially lethal doses of multiple psychiatric medications with high-risk profiles and unknown and unknowable drug interactions by automatic protocols without adequate physician input.** These interactions include such variables as multiple dose response, idiosyncratic reactions and complex effect of these medications. Despite notice and predictability of these outcomes and future outcomes through Universal's use of robo-psychiatry, automaton medicine and maximal medication use, intentional acts and manipulation by fiduciaries and employees of Universal have sought to falsely portray and report these outcomes through selective manipulation and programmed failure of traditional quality control mechanisms.

### Numerous Examples of Universal's Systemic Fraud

71.     There is considerable media attention regarding fraud and abuse at Universal's facilities. See: Rick Santorum-Linked Universal Health Services Facility: Fraud, Assault And Alleged "Exorcism", (Exhibit 21, Available at:

45

http://www.huffingtonpost.com/2012/01/06/rick-santorum-uhs_n_1186443.html).

**Lakewood Ranch Medical Center, Florida**

72.    On 21 April 2008 the Florida Agency for Health Care Administration ("FAHCA") issued an ACHA – Statement of Deficiencies and Plan for Correction for Lakewood Ranch Medical Center regarding violation of pharmacy/medications procedures where one of four files examined revealed that ***physicians orders were not clarified or followed and that the patient was not properly administered medication***. The FAHCA also found nursing services violations in its Statement of Deficiencies in the nursing process of assessment and evaluation and based on a record review and staff interview it was determined that ***the facility failed to ensure assessment of vital signs and neurological status*** for ***2 of 4*** sampled ***patients***.

73.    On 06 August 2008 FAHCA noted Lakewood Ranch Medical Center ***failed to ensure medications were administered according to physician orders*** where an intensive care unit (ICU) patient was not given medications according to orders.

46

74. On 03 September 2008 FAHCA determined Lakewood Ranch Medical Center **failed to ensure written standards of nursing practice and related policy and procedure** to define conduct of patient care by nursing staff.

75. On 09 December 2010 FAHCA again cited Lakewood Ranch Medical Center for deficiencies of the Condition of Participation for Emergency Services. It was determined the **facility failed to ensure** a registered **nurse supervised and evaluated the nursing care for each patient and follow the physician ordered plan of care** for 2 of 3 patients sampled. A *patient's vital signs were not monitored as ordered* by the physician after cardiac catheterization. Another patient was admitted with chest pain and the physician ordered Dilaudid, which was administered at least twice. In violation of policy, there was **no reassessment of the patient's pain level after the Dilaudid was administered.**

76. "During the latter hours of August 4, 2008 and into the early morning of August 5, 2008, Mr. McCall got up from his bed while disoriented and when several staff members tried to get him back into bed, he fell hitting his back against the bed. There are **no such notations and/or remarks in the medical chart/records of this fall with Lakewood Ranch Medical Center.**" "**The nursing staff failed**

***to properly contact the MD regarding the fall*** that occurred on or about August 4, 2008 . . . ***failed to provide and document proper follow-up care and assessments regarding injuries related to the fall*** . . . [and] ***failed to follow standards of care, protocol and procedure*** which are common practices at institutions such as Lakewood Ranch Medical Center . . . ***[resulting in] delayed care and treatment for the injuries*** suffered by Mr. Gilbert McCall." (Exhibit 15, McCall v. Manatee Memorial Hospital, L.P., Lakewood Ranch Medical Center, Universal Health Services, Inc. et al. Case No. 1009474 (12 Cir. FL 2010)).

## Charter Pines Behavioral Health System, LLC, South Carolina

77.   **Prior to his death, William Todd Crawford was a 32 year old who voluntarily admitted himself to Charter Pines Behavioral Health System, LLC "for assistance in avoiding addiction to pain medication prescribed following surgery."**

78.   A suit was filed 12 January 2007 in the U.S. District Court (District of South Carolina, Spartanburg Division) alleging, inter alia, ***failure to "supervise and monitor William Todd Crawford"***, ***failure "to follow the applicable standards of medicine and behavioral health"***,

48

failure   to   "follow   Defendant's   own   policies   and
procedures", and failure "to respond to William Todd
Crawford's condition." (Exhibit 16, Crawford v. Charter
Pines Behavioral Health System, LLC (U.S. Dist. SC, 2007)).

### Premier Behavioral Solutions of Florida, Inc., d/b/a Manatee Palms Youth Services

79.    Premier   Behavioral   Solutions   of   Florida,   Inc.,
d/b/a Manatee Palms Youth Services ("Manatee") is licensed
to operate a sixty (60) bed Intensive Residential Treatment
Program for Children and Adolescents in Bradenton, Florida.
An **Emergency Suspension of License Order and Moratorium on
Admissions was issued on 27 April 2007 by the State of
Florida,** Agency ("Agency") for Health Care Administration
and the parties entered into a settlement dated 10 May
2007. The Agency found Manatee to **"present (1) a clear and
present danger to the public health and safety, (2) a
threat to the health, safety or welfare of a client, and
(3) an immediate serious danger to the public health,
safety or welfare."**

80.    Out of 43 patients per the facility census on 27
April 2007, Manatee **only identified two (2) patients who
were placed under suicide precautions** (requiring higher

49

acuity monitoring with "one to one supervision"); however, upon a review of the records, **"eighteen (18) patients, not two (2) patients, were actually placed under suicide precautions."**

81.    **Sixteen (16) of 43 patients (over 37%) were in Manatee's DRG churning program that were not identifiable upon review without thoroughly reviewing the medical records.**

82.    The Agency also found that "staff members are not qualified for their responsibilities" and "one employee with documented episodes of **sleeping while on duty** and *falsifying Facility records remains employed.*" (Exhibit 22 Emergency Suspension of License Order and Moratorium on Admissions, pages 3, 12 and 14).

## Clarion Psychiatric Center (UHS of Pennsylvania, Inc.)

83.    A Mental Health Program Representative of the Deputy Secretary for Mental Health and Substance Abuse Services surveyed Clarion Psychiatric Center on 30 September 2010 resulting in a Statement of Deficiencies for noncompliance. (Exhibit 23, pages 1 and 2).

84.    **All** charts reviewed in the 30 September 2010 survey contained *voluntary and involuntary forms* that "*were*

50

*either incomplete or did not have adequate information describing the necessity for inpatient treatment compromising the validity of both voluntary and involuntary commitments.*" (Exhibit 23, page 4).

85.     "One chart reviewed had no written application or petition on an individual who received inpatient services."

86.     "Single words and partial sentences were often used in the narrative section where the findings of the assessment must be documented." (Exhibit 23, page 4).

87.     Clarion Psychiatric Center's provisional license 21 June 2011, contained deficiencies very similar to Charter Peachford. (Exhibit 24)

88.     Of 11 charts pulled, 8 (**72.7%**) had "*inadequate preliminary assessment information, missing consumer and physician signatures, and signatures not dated.* This issue was addressed also during the 2008, 2009 and 2010 surveys." (Exhibit 24, page 3).

89.     **5 of the 11 (45.5%)** charts pulled "*reflected that chemical restraints/standing PRN medications are ordered upon admission of consumers prior to seeing a physician.*" (Exhibit 24, page 4).

90.     "*The ordered medications are not individualized based on the need per specific episode for the individual consumer.*" (Exhibit 24, page 4).

91.    "*The order of chemical restraints without an
assessment by a physician is in violation of Clarion
Psychiatric Center's own policy.*" (Exhibit 24, page 4).

92.    "*The treatment plans do not document the use of
chemical restraints or necessity for them based on an
initial assessment of the presenting problem.* There is no
documentation of less restrictive alternatives utilized or
planned for in the treatment plan." (Exhibit 24, page 5).

93.    Eight of the 11 charts (**72.7%**) "included
treatment plans with missing physician or consumer
signatures.   When signatures are present *it appears that
treatment plans are being signed at the time of discharge.*
Because of the varied or missing dates on the signatures it
appears that *treatment professionals are not meeting as a
team and collaborating on the course of treatment.* The
language in the treatment plan indicates that *consumers are
not engaged in the development of the plan or are given the
opportunity for input.*" (Exhibit 24, pages 5 and 6).


**Friends Hospital, Friends Behavioral Health System, L.P.**


94.    Friends   Hospital   was   granted   a   Provisional
license on 12 September 2009 after a team of Mental Health
Program Representatives surveyed its program on August 10,

11 and 12th, 2009 in response to Friends Hospital's failure to implement corrective action from a proposed correction dated 12 June 2009. (Exhibit 25, pages 1, 2 and 3).

95.    In   one   of   the   corrective   plans   requiring supervisors or RNs to sign-off on q15s and all levels of observation it was found that out "of 63 "Treatment Plan Content and Observation Audit" forms, the item "**Are all observation and sheets filled out completely**?" 56 (**88.8%**) were checked "**No**"." (Exhibit 25, page 3).

96.    Patients placed on suicide watch "Line of Sight" level of observation required by the practice guidelines were actually placed on Friends Hospital's q15s per their policy – and at that **inappropriate level of monitoring no monitoring was done 88.8% of the time**. (Exhibit 25, pages 4 and 5).

97.    A review of the clinical charts of consumers found 8 that indicated "a **failure by the director of the treatment team to adequately review treatment plans** and tools used in the development of the treatment plan.  This is a **repeat deficiency**." (Exhibit 25, page 8).

98.    In a letter dated 2 May 2011 Friends Hospital received a letter regarding a follow-up survey by a team of Mental Health Program Representatives on February 9-11, 2011. (Exhibit 26, page 2).

99.    In the February 9-11, 2011 survey it was found that 14 consumers "had *incomplete rounds sheets with staff not signing off at the end of shift or blanks on the sheet itself.*"   Two   consumers   "had   *inconsistencies   between Physician's Orders and the rounds sheets.*" (Exhibit 26, page 4).

100.    Friends Hospital did not follow its policy of having photographs on the consumers' charts and wristbands as   identifiers   as   "*Zero   of   32*   consumer   charts   had accompanying photographs" and "*Zero of 32* consumer charts had any indication on the admission paperwork (the boxes were not checked) whether wristbands were distributed or not." (Exhibit 26, page 6).

## Universal Conceals Fraud Using Fraudulent Peer Review

101.    Relator has just recently uncovered the systemic nature of Universal's ongoing fraud.

102.    Universal has **concealed its fraud,** by and through its agents and employees.

103.    Specifically, Tommie Richardson, the clinical director involved in the patient's case, pulled his own clinical note from the medical chart to "self" peer review

in order to hide from liability under the color of state law - Georgia's peer review privilege.

### Universal's Profits from Fraud

104.   Universal Health Services, Inc. derived 22% of its **$24 Billion** gross revenues from Medicare and 15% from Medicaid in 2011.   Universal Behavioral Health Care Facilities (of which UHS of Peachford, L.P. is included) derived 17% of its gross revenues from Medicare and 24% from Medicaid in 2011. (Exhibit 12, pages 65, 136).

105.   Universal has **outpaced** its **peer group** by approximately **double** over the past 4 years.   One hundred dollars invested in Universal versus its peer group in 2006 equates to a **return of $144.17 for Universal versus $67.09 for its peer group in 2011.** (Exhibit 12, page 42).

106.   Universal's Behavioral Health Facilities have reduced occupancy rates for available beds from 75% in 2007 to 73% in 2011, and Universal's Acute Care Hospitals have reduced occupancy rates for available beds from 63% in 2007 to 58% in 2011. (Exhibit 12, pages 7, 43).

107.   Universal's Behavioral Health Facilities have reduced the average length of stay from 16.8 days in 2007 to 14.6 days in 2011, and Universal's Acute Care Hospitals have similar average lengths of stay of 4.5 days in 2007 and 4.4 days in 2011. Exhibit 12, pages 7, 43).

108. Universal's Behavioral Health Facilities **net revenues increased 108%** or $1.77 billion to **$3.40 billion** during 2011. (Exhibit 12, page 61).

109. **Universal's net revenues have increased over 60.15% from 2007 to 2011 from $4,683,150,000.00 in 2007 to $7,500,198,000.00 in 2011.** (Exhibit 12, page 43).

## VI. CAUSES OF ACTION

**COUNT I**
**SUBSTANTIVE VIOLATIONS OF THE FALSE CLAIMS ACT**

**[31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), (a)(1) and 3732(b)]**

110. Mr. Potts incorporates all previous allegations as if fully set forth verbatim here.

111. Through the acts described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented to an officer or employee of the United States Government and state governments participating in the Medicaid program, false and fraudulent claims, records, and statements in order to obtain reimbursement for healthcare services provided under Medicare, Medicaid and CHAMPUS.

112. In addition, or alternatively, through the acts described above and otherwise, Defendants, by and through

their officers, agents and employees, knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States.

113.   In addition, or alternatively, through the acts described above and otherwise, Defendants, by and through their officers, agents and employees, had possession, custody, or control of property used, or to be used, by the United States and, intending to defraud the United States or willfully to conceal the property, delivered or caused to be delivered less property than the amount for which the Defendant received a certificate or receipt.

114.   The United States, its fiscal intermediaries, and the state Medicaid programs, unaware of the falsity of the records, statements, and claims made or submitted by defendants and their agents and employees paid and continue to pay defendants for claims that would not be paid if the truth were known.

115.   By reason of the defendants' false records, statements, claims, and omissions, the United States and the state Medicaid programs have been damaged in the amount of many billions of dollars in Medicare, Medicaid and CHAMPUS funds.

116.    Each of the actions described in the Paragraphs within Count I is a violation of the False Claims Act, 31 U.S.C. § 3729, for which the Defendants are liable for damages as mandated by the statute.

**COUNT II**
**FALSE CLAIMS ACT CONSPIRACY**

**[31 U.S.C. § 3729(a)(3) and 3732(b)]**

117.    Mr. Potts incorporates all previous allegations as if fully set forth verbatim again.

118.    This is a claim for treble damages and for forfeitures under the False Claims Act 31 U.S.C. §§ 3729 et seq., as amended.

119.    Through the acts described above and otherwise, defendants entered into a conspiracy or conspiracies among themselves and with others to defraud the United States and state Medicaid programs by getting false and fraudulent claims allowed or paid.  Defendants have also conspired to omit disclosing or to actively conceal facts, or both which, if known, would have reduced government obligations to them, or resulted in repayments from them to government programs.   Defendants have taken substantial steps in furtherance of those conspiracies, inter alia, by preparing

false reports and other records and by submitting such records to the Government for payment and approval.

120. The United States, its fiscal intermediaries, and state Medicaid programs, unaware of defendants' conspiracies and falsity of the records, statements and claims made by defendants and their agents, employees and co-conspirators, and a result thereof, have paid and continue to pay billions of dollars in Medicare, Medicaid, and CHAMPUS reimbursement that they would not otherwise have paid and continue to pay. Furthermore, because of the false records, statements, claims, and omissions by defendants and their agents, employees and co-conspirators, the United States, its fiscal intermediaries, and state Medicaid programs have not recovered Medicare, Medicaid, and CHAMPUS funds from the defendants that otherwise would have been recovered.

121. By reason of defendants' conspiracies and the acts taken in furtherance thereof, the United States and the state Medicaid programs have been damaged in the amount of many billions of dollars in Medicare, Medicaid and CHAMPUS funds.

**COUNT III**
**SOCIAL SECURITY ACT ("SSA")**

**[SSA AND HIPAA 42 U.S.C. § 1320a-7(b)(6)(B), (13)]**

122.   Mr. Potts incorporates all previous allegations as if fully set forth again here. As described above, Defendants, by and through their officers, agents and employees, failed to meet professionally recognized standards of health care.

123.   As described above, Defendants, by and through their officers, agents and employees, failed to substantially comply with the HHS corrective actions plan, including but not limited to completing Narcotics Withdrawal Scales.

124.   Each of the actions described in the Paragraphs within Count IV is a violation of the Social Security Act and HIPAA, 42 U.S.C. § 1320a-7(b)(6)(B), (13), for which Defendants are liable for damages as mandated by the statute.

**COUNT IV**
**HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT ("HIPAA")**

**[HIPAA § 1347(2)]**

125.   Mr. Potts incorporates all previous allegations as if fully set forth again here.

126.   As described above, Defendants, by and through their officers, agents and employees, knowingly and

willfully executes, or attempts to execute, a scheme or artifice to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.

127.   Each of the actions described in the Paragraphs within Count V is a violation of HIPAA § 1347(2), for which Defendants are liable for damages as mandated by the statute.

**STATE FALSE CLAIMS:**

**COUNT V**
**GEORGIA STATE FALSE MEDICAID CLAIMS ACT**

**[GSFMCA § 49-4-168.1 (a)(1), (2), (3) and (7)]**

128.   Mr. Potts incorporates all previous allegations as if fully set forth again here.

129.   Defendants have repeatedly and continuously violated the Georgia State False Medicaid Claims Act (hereinafter "GSFMCA").

130.   As described above, Defendants, by and through their officers, agents and employees, acted knowingly in presenting or causing to be presented to the Georgia

Medicaid program a false or fraudulent claim for payment or approval.

131. As described above, Defendants, by and through their officers, agents and employees, acted knowingly in making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program.

132. As described above, Defendants, by and through their officers, agents and employees, conspired to defraud the Georgia Medicaid program by getting false or fraudulent claims allowed or paid.

133. As described above, Defendants, by and through their officers, agents and employees, acted knowingly in making, using, or causing to be made or used, false records or statements or both to conceal, avoid, or decrease an obligation to pay, repay or transmit money or property to the State of Georgia.

134. The United States of America has been damaged as a result of the Defendants' violation of the GSFMCA.

135. Each of the actions described in Paragraphs within COUNT V is a violation of the GSFMCA § 49-4-168.1 (a)(1), (2), and (7), for which Defendants are liable for damages as mandated by the statute.

**COUNT VI**

**CALIFORNIA FALSE CLAIMS ACT**

**[CA GOVERNMENT CODE SECTIONS 12650-12656,
12651(a)(1)(2)(3)(7)]**

136. Mr. Potts incorporates all previous allegations as if fully set forth again here.

137. Defendants have repeatedly and continuously violated the California False Claims Act.

138. As described above, Defendants, by and through their officers, agents and employees, acted knowingly in presenting or causing to be presented a false or fraudulent claim for payment or approval.

139. As described above, Defendants, by and through their officers, agents and employees, acted knowingly in making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

140. As described above, Defendants, by and through their officers, agents and employees conspired to commit a violation of this subdivision.

141. The United States of America has been damaged as a result of the Defendants' violation of the California False Claims Act.

142. Each of the actions described in Paragraphs within COUNT VI is a violation of the California False

Claims Act, § 12651(a)(1), (2), (3) and (7), for which Defendants are liable for damages as mandated by the statute.

**COUNT VII**
**COLORADO MEDICAL ASSISTANCE ACT**

**[Colo. Rev. Stat. §§ 25.5-4-304 to 25.5-4-310, 25.5-4-305 (a), (b) and (g)]**

143.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

144.    Defendants have repeatedly and continuously violated the Colorado Medical Assistance Act.

145.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly in presenting, or causing to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval.

146.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly by making, or causing to be made or used a false record or statement material to a false or fraudulent claim.

147.    As described above, Defendants, by and through their officers, agents and employees conspired to commit a violation of this subsection of the Colorado Medical Assistance Act.

148.    The United States of America has been damaged as a result of the Defendants' violation of the Colorado Medical Assistance Act.

149.    Each of the actions described in Paragraphs within COUNT VII is a violation of the Colorado Medical Assistance Act § 25.5-4-305 (a), (b), and (g), for which Defendants are liable for damages as mandated by the statute.

**COUNT VIII**
**The Connecticut False Claims Act**

**[Conn. Gen. Stat. § 17b-301b]**

150.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

151.    Defendants have repeatedly and continuously violated the Connecticut False Claims Act.

152.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly in presenting, or causing to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services.

153.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly by making, or causing to be made or used, a false record or

statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services.

154. As described above, Defendants, by and through their officers, agents and employees conspired to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services.

155. The United States of America has been damaged as a result of the Defendants' violation of the Connecticut False Claims Act.

156. Each of the actions described in Paragraphs within COUNT VIII is a violation of the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b(a)(1), (2) and (3), for which Defendants are liable for damages as mandated by the statute.

**COUNT IX**
**Delaware False Claims and Reporting Act**

**[Del. Code Ann. tit. 6, §§ 1201-1209, 1201(a)(1), (2), and (3)]**

157. Mr. Potts incorporates all previous allegations as if fully set forth again here.

158. Defendants have repeatedly and continuously violated the Connecticut False Claims Act.

159.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly by presenting, or causing to be presented to an officer or employee of the Government a false or fraudulent claim for payment or approval.

160.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly by making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government.

161.    As described above, Defendants, by and through their officers, agents and employees conspired to defraud the Government by getting false or fraudulent claim(s) allowed or paid.

162.    The United States of America has been damaged as a result of the Defendants' violation of the Delaware False Claims and Reporting Act.

163.    Each of the actions described in Paragraphs within COUNT IX is a violation of the Delaware False Claims and Reporting Act, tit. 6, § 1201(a)(1), (2) and (3), for which Defendants are liable for damages as mandated by the statute.

**COUNT X**
**FLORIDA FALSE CLAIMS ACT**

**[Fla. Stat. Ann. §§ 68.081-68.092, 68.082(2)(a), (b) and (c)]**

164. Mr. Potts incorporates all previous allegations as if fully set forth again here.

165. Defendants have repeatedly and continuously violated the Florida False Claims Act.

166. As described above, Defendants, by and through their officers, agents and employees, acted knowingly by presenting, or causing to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval.

167. As described above, Defendants, by and through their officers, agents and employees, acted knowingly by making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

168. As described above, Defendants, by and through their officers, agents and employees conspired to submit false or fraudulent claim(s) to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

169. The United States of America has been damaged as a result of the Defendants' violation of the Florida False Claims Act.

170. Each of the actions described in Paragraphs within COUNT X is a violation of the Florida False Claims Act § 68.082(2)(a), (b) and (c), for which Defendants are liable for damages as mandated by the statute.

**COUNT XI**
**Illinois False Claims Act**

**[740 ILCS 175/1-8, Sec. 3(a)(1)(A), (B) and (C)]**

171. Mr. Potts incorporates all previous allegations as if fully set forth again here.

172. Defendants have repeatedly and continuously violated the Illinois False Claims Act.

173. As described above, Defendants, by and through their officers, agents and employees, acted knowingly by presenting, or causing to be presented a false or fraudulent claim for payment or approval.

174. As described above, Defendants, by and through their officers, agents and employees, acted knowingly by making, using or causing to be made or used a false record or statement material to a false or fraudulent claim.

175. As described above, Defendants, by and through their officers, agents and employees conspired to commit a violation of subparagraph (A), (B) of Sec. 3(a)(1) of the Illinois False Claims Act.

176. The United States of America has been damaged as a result of the Defendants' violation of the Illinois False Claims Act.

177. Each of the actions described in Paragraphs within COUNT XI is a violation of the Illinois False Claims Act, 740 ILCS 175/ § 3(a)(1)(A), (B) and (C), for which Defendants are liable for damages as mandated by the statute.

**COUNT XII**
**Indiana False Claims and Whistleblower Protection Act**

**[Ind. Code § 5-11-5.5, Sec. 2(b)(1), (2), (7) and (8)]**

178. Mr. Potts incorporates all previous allegations as if fully set forth again here.

179. Defendants have repeatedly and continuously violated the Indiana False Claims and Whistleblower Protection Act.

180. As described above, Defendants, by and through their officers, agents and employees, acted knowingly or intentionally by presenting to the state a false claim for payment or approval.

181. As described above, Defendants, by and through their officers, agents and employees, acted knowingly or intentionally by making or using a false record or

statement to obtain payment or approval of a false claim from the state.

182.   As described above, Defendants, by and through their officers, agents and employees conspired with another person to perform an act described in subdivisions (1) through (6) of Sec. 2(b) of the Indiana False Claims and Whistleblower Protection Act, or caused or induced another person to perform an act described in subdivisions (1) through (6).

183.   The United States of America has been damaged as a result of the Defendants' violation of the Indiana False Claims and Whistleblower Protection Act.

184.   Each of the actions described in Paragraphs within COUNT XII is a violation of the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5-2(b)(1), (2), (7) and (8), for which Defendants are liable for damages as mandated by the statute.

**COUNT XIII**
**Louisiana Medical Assistance Programs Integrity Law**

**[La. Rev. Stat. Ann. § 438, 438.3 A., B. C., D.(1), D.(2), D.(3), E., 438.4 A.]**

185.   Mr. Potts incorporates all previous allegations as if fully set forth again here.

186.    Defendants   have   repeatedly   and   continuously
violated   the   Louisiana   Medical   Assistance   Programs
Integrity Law.

187.   As  described  above,  Defendants,  by  and  through
their officers, agents and employees, knowingly presented
or caused to be presented a false or fraudulent claim.

188.   As  described  above,  Defendants,  by  and  through
their officers, agents and employees, knowingly engaged in
misrepresentation to obtain, or attempt to obtain, payment
from medical assistance programs funds.

189.   As  described  above,  Defendants,  by  and  through
their officers, agents and employees, conspired to defraud,
or  attempt  to  defraud,  the  medical  assistance  programs
through misrepresentation or by obtaining, or attempting to
obtain, payment for a false or fraudulent claim.

190.   As  described  above,  Defendants,  by  and  through
their officers, agents and employees, knowingly submitted a
claim for goods, services, or supplies which were medically
unnecessary  or  which  were  of  substandard  quality  or
quantity.

191.   As  described  above,  Defendants,  by  and  through
their  officers,  agents  and  employees,  failed  to  provide
medically  necessary  goods,  services,  or  supplies  -  or
goods,  services,  or  supplies  which  were  of  substandard

quality or quantity to a recipient, and those goods, services, or supplies are covered under a managed care contract or voucher contract with the medical assistance programs.

192.   As described above, Defendants, by and through their officers, agents and employees, provided "substandard quality" services as to the appropriate standard of care as used to determine medical malpractice, including but not limited to, the standard of care provided in R.S. 9:2794.

193.   As described above, Defendants, by and through their officers, agents and employees, Knowingly made, used, or caused to be made or used a false, fictitious, or misleading statement on any form used for the purpose of certifying or qualifying any person for eligibility for the medical assistance programs or to receive any good, service, or supply under the medical assistance programs which that person is not eligible to receive.

194.   The United States of America has been damaged as a result of the Defendants' violation of the Louisiana Medical Assistance Programs Integrity Law.

195.   Each of the actions described in Paragraphs within COUNT XIII is a violation of the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §

438, for which Defendants are liable for damages as mandated by the statute.

**COUNT XIV**
**Massachusetts False Claims Act**

**[Mass. Gen. Laws Ann. Ch. 12, §§ 5-50, 5B (1), (2), (3), (7) and (9)]**

196.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

197.    Defendants have repeatedly and continuously violated the Massachusetts False Claims Act.

198.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval.

199.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof.

200.    As described above, Defendants, by and through their officers, agents and employees conspired to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim.

74

201.    As described above, Defendants, by and through their officers, agents and employees entered into an agreement, contract or understanding with one or more officials of the commonwealth or any political subdivision thereof knowing the information contained therein is false.

202.    As described above, Defendants, by and through their officers, agents and employees are a beneficiary of an inadvertent submission of a false claim to the commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and failed to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

203.    The United States of America has been damaged as a result of the Defendants' violation of the Massachusetts False Claims Act.

204.    Each of the actions described in Paragraphs within COUNT XIV is a violation of the Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12, §§ 5-50, 5B (1), (2), (3), (7) and (9), for which Defendants are liable for damages as mandated by the statute.

**COUNT XV**
**Michigan Medicaid False Claim Act**

**[Mich. Comp. Laws §§ 400.601-400.612, 400.606(1), 400.607(1), 400.607(2), 400.612(1) and (2)]**

205.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

206.    Defendants have repeatedly and continuously violated the Michigan False Claim Act.

207.    As described above, Defendants, by and through their officers, agents and employees, entered into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false claim under the social welfare Act No. 280 of the Public Acts of 1939, as amended being sections 400.1 to 400.121 of the Michigan Compiled Laws.

208.    As described above, Defendants, by and through their officers, agents and employees, made or presented or caused to be made or presented to an employee or officer of Michigan a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false.

209.    As described above, Defendants, by and through their officers, agents and employees, made or presented or caused to be made or presented a claim(s) under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, that Defendants know falsely represents that the goods or services for which the claim is made were medically

necessary in accordance with professionally accepted standards and the Defendants in a conspiracy, combination, or collusion with a physician or other provider falsely represents the medical necessity of the particular goods or services for which the claim was made – and each claim in this subsection is a separate offense.

210.   As described above, Defendants, by and through their officers, agents and employees, received a benefit that Defendants were not entitled to receive by reason of fraud or making a fraudulent statement or knowingly concealing a material fact, or engaged in conduct prohibited by the Michigan Medicaid False Claim Act.

211.   The United States of America has been damaged as a result of the Defendants' violation of the Michigan Medicaid False Claim Act.

212.   Each of the actions described in Paragraphs within COUNT XV is a violation of the Michigan Medicaid False Claim Act, Mich. Comp. Laws §§ 400.601-400.612, for which Defendants are liable for damages as mandated by the statute.

**COUNT XVI**
**Minnesota False Claims Act**

**[Minn. Stat. Ann. §§ 15C.01-15C.16, 15C.02 (1), (2), (3) and (7)]**

213.   Mr. Potts incorporates all previous allegations as if fully set forth again here.

214.   Defendants have repeatedly and continuously violated the Minnesota False Claims Act.

215.   As described above, Defendants, by and through their officers, agents and employees, knowingly present, or caused to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval.

216.   As described above, Defendants, by and through their officers, agents and employees, knowingly made or used, or cause to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision.

217.   As described above, Defendants, by and through their officers, agents and employees knowingly conspired to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or make, use, or cause to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim.

218.   As described above, the activities involving false or fraudulent claims of Defendants, by and through

their officers, agents and employees did not result due to mere negligence, inadvertence or mistake.

219.    The United States of America has been damaged as a result of the Defendants' violation of the Minnesota False Claims Act.

220.    Each of the actions described in Paragraphs within COUNT XVI is a violation of the Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq., for which Defendants are liable for damages as mandated by the statute.

**COUNT XVII**
**NEVADA FALSE CLAIMS ACT**

**[Nev. Rev. Stat. Ann. §§ 357.010-357.250, 357.040(1)(a), (b), (c) and (h)]**

221.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

222.    Defendants have repeatedly and continuously violated the Nevada False Claims Act.

223.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented a false claim(s) for payment or approval.

224.    As described above, Defendants, by and through their officers, agents and employees, knowingly made or

used, or caused to be made or used, a false record or statement to obtain payment or approval of a false claim.

225. As described above, Defendants, by and through their officers, agents and employees conspired to defraud by obtaining allowance or payment of a false claim.

226. As described above, Defendants, by and through their officers, agents and employees are a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, failed to disclose the falsity to the State or political subdivision within a reasonable time.

227. The United States of America has been damaged as a result of the Defendants' violation of the Nevada False Claims Act.

228. Each of the actions described in Paragraphs within COUNT XVII is a violation of the Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.010-357.250, for which Defendants are liable for damages as mandated by the statute.

**COUNT XVIII**
**New Jersey False Claims Act**

[N.J. Stat. Ann. §§ 2A:32C-1 through 2A:32C-15]

229. Mr. Potts incorporates all previous allegations as if fully set forth again here.

230. Defendants have repeatedly and continuously violated the New Jersey False Claims Act.

231. As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval.

232. As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State.

233. As described above, Defendants, by and through their officers, agents and employees conspired to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

234. The United States of America has been damaged as a result of the Defendants' violation of the New Jersey False Claims Act.

235. Each of the actions described in Paragraphs within COUNT XVIII is a violation of the New Jersey False

Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 through 2A:32C-15, for which Defendants are liable for damages as mandated by the statute.

**COUNT XIX**
**New Mexico Medicaid False Claims Act**

**[§§ 27-14-1 to 27-14-15, § 27-14-4 A., B., C., D., G. and H]**

236.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

237.    Defendants have repeatedly and continuously violated the New Mexico Medicaid False Claims Act.

238.    As described above, Defendants, by and through their officers, agents and employees, presented, or caused to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent.

239.    As described above, Defendants, by and through their officers, agents and employees, presented, or caused to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program.

240.    As described above, Defendants, by and through their officers, agents and employees, made, used or caused to be made or used a record or statement to obtain a false

or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false

241. As described above, Defendants, by and through their officers, agents and employees conspired to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent.

242. As described above, Defendants, by and through their officers, agents and employees knowingly made a false statement or misrepresentation of material fact concerning the conditions or operation of a health care facility in order that the facility may qualify for certification or recertification required by the Medicaid program.

243. As described above, Defendants, by and through their officers, agents and employees knowingly made a claim under the Medicaid program for a service or product that was not provided.

244. The United States of America has been damaged as a result of the Defendants' violation of the New Mexico Medicaid Fraud Claims Act.

245. Each of the actions described in Paragraphs within COUNT XIX is a violation of the New Mexico Medicaid False Claims Act, §§ 27-14-1 to 27-14-15, for which

Defendants are liable for damages as mandated by the statute.

**COUNT XX**
**New Mexico Fraud Against Taxpayers Act**

**[§§ 44-9-1 to 44-9-14, § 44-9-3-A. (1), (2), (3) and (9)]**

246.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

247.    Defendants have repeatedly and continuously with or without specific intent have violated the New Mexico Fraud Against Taxpayers Act.

248.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented, or caused to be presented, to an employee, officer or agent of the state or to a contractor, grantee or other recipient of state funds a false or fraudulent claim for payment or approval.

249.    As described above, Defendants, by and through their officers, agents and employees, knowingly made or used, or caused to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim.

250.    As described above, Defendants, by and through their officers, agents and employees, conspired to defraud

the state by obtaining approval or payment on a false or fraudulent claim.

251.   As described above, Defendants, by and through their officers, agents and employees, as a beneficiary of an inadvertent submission of a false claim and having subsequently discovered the falsity of the claim, failed to disclose the false claim to the state within a reasonable time after discovery.

252.   The United States of America has been damaged as a result of the Defendants' violation of the New Mexico Fraud Against Tax Payers Act.

253.   Each of the actions described in Paragraphs within COUNT XX is a violation of the New Mexico Fraud Against Taxpayers Act, §§ 44-9-1 to 44-9-14, for which Defendants are liable for damages as mandated by the statute.

**COUNT XXI**
**Oklahoma Medicaid False Claims Act**

**[Okla. Stat. tit. 63. §§ 5053-5053.7, § 5053.1 B. (1), (2) and (3)]**

254.   Mr. Potts incorporates all previous allegations as if fully set forth again here.

255.   Defendants have repeatedly and continuously violated the Oklahoma Medicaid False Claims Act.

256.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented, or caused to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval.

257.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state.

258.    As described above, Defendants, by and through their officers, agents and employees conspired to defraud the state by getting a false or fraudulent claim allowed or paid.

259.    The United States of America has been damaged as a result of the Defendants' violation of the Oklahoma Medicaid False Claims Act.

260.    Each of the actions described in Paragraphs within COUNT XXI is a violation of the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63. §§ 5053-5053.7, for which Defendants are liable for damages as mandated by the statute.

**COUNT XXII**
**Tennessee False Claims Act**

[Tenn. Code Ann. §§ 4-18-101 to 4-18-108, 4-18-103(a) (1), (2), (3), (8) and (9)]

261. Mr. Potts incorporates all previous allegations as if fully set forth again here.

262. Defendants have repeatedly and continuously violated the Tennessee False Claims Act.

263. As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval.

264. As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision.

265. As described above, Defendants, by and through their officers, agents and employees conspired to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

266. As described above, Defendants, by and through their officers, agents and employees, are beneficiaries of

an inadvertent submission of a false claim to the state or a political subdivision, who subsequently discovered the falsity of the claim, and failed to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

267.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from the state or any political subdivision.

268.    The United States of America has been damaged as a result of the Defendants' violation of the Tennessee False Claims Act.

269.    Each of the actions described in Paragraphs within COUNT XXII is a violation of the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 to 4-18-108, for which Defendants are liable for damages as mandated by the statute.

**COOUNT XXIII**
**Texas Medicaid Fraud Prevention Law**

**[Tex. Hum. Res. Code Ann. §§ 36.001 to 36.132,**
**36.002(4)(A), (7), (9), and (10)]**

270.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

271. Defendants have repeatedly and continuously violated the Texas Medicaid Fraud Prevention Law.

272. As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval.

273. As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision.

274. As described above, Defendants, by and through their officers, agents and employees knowingly entered into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent.

275. As described above, Defendants, by and through their officers, agents and employees, knowingly made, caused to be made, induced, or seek to induce the making of a false statement or misrepresentation of material fact concerning the conditions or operation of a facility in order that the facility may qualify for certification or

recertification required by the Medicaid program, including certification or recertification of Defendants' hospitals and facilities.

276. As described above, Defendants, by and through their officers, agents and employees, knowingly made or caused to be made a claim under the Medicaid program for a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner; a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate.

277. As described above, Defendants, by and through their officers, agents and employees are a managed care organization that contracts with the Health and Human Services Commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly failed to provide to an individual a health care benefit or service that the organization is required to provide under the contract.

278. The United States of America has been damaged as a result of the Defendants' violation of the Texas Medicaid Fraud Prevention Law.

279. Each of the actions described in Paragraphs within COUNT XXIII is a violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001 to 36.132, for which Defendants are liable for damages as mandated by the statute.

**COUNT XXIV**
**Virginia Fraud Against Taxpayers Act**

**[Va. Code Ann. §§ 8.01-216.1 to 8.01-216.19, § 8.01-216.3 A. (1), (2) and (3)]**

280. Mr. Potts incorporates all previous allegations as if fully set forth again here.

281. Defendants have repeatedly and continuously violated the Virginia Fraud Against Taxpayers Act.

282. As described above, Defendants, by and through their officers, agents and employees, knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval.

283. As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

284.    As described above, Defendants, by and through their officers, agents and employees conspired to commit a violation of subdivision 1 and 2 of § 8.01-216.3 A.

285.    The United States of America has been damaged as a result of the Defendants' violation of the Virginia Fraud Against Taxpayers Act.

286.    Each of the actions described in Paragraphs within COUNT XXIV is a violation of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 to 8.01-216.19, for which Defendants are liable for damages as mandated by the statute.

### VII. **PRAYER FOR RELIEF**

287.    Mr. Potts respectfully prays that Defendants be cited to appear and answer herein and that upon a final hearing of the cause, that judgment be entered for the United States and Mr. Potts against Defendants as follows:

A. As to violation of the False Claims Act, the following:

i.   The defendants cease and desist from violating 31 U.S.C. § 3729 et seq.

ii.  Judgment against Defendants, in an amount equal to three times the amount of damages the United States

92

of America has sustained because of Defendants'
actions, plus a civil penalty against each defendant
of $10,000.00 for each violation of 31 U.S.C. § 3729,
the costs of this action, with interest, including the
cost to the United States of America for its expenses
related to this action;

iii. Relator awarded all costs incurred, including
reasonable attorneys' fees;

iv. In the event the United States of America
proceeds with this action, that the Relator be awarded
an amount for bringing this action of at least 15%,
but not more than 25% of the proceeds of the action or
settlement of the claim;

v. In the event the United States of America does
not proceed with this action, that the Relator be
awarded the amount the Court determines is reasonable
for collecting the civil penalty and damages, which
shall not be less than 25% nor more than 30% of the
proceeds of the action or settlement;

vi. Relator awarded prejudgment interest;

vii. United States of America and Relator receive all
relief, both at law and equity, to which they may
reasonably appear entitled.

B. As to violations of the Social Security Act, the following:

    i. Defendants, individuals and entities, be excluded from participation in any Federal health care program as defined in § 1320a-7b(f).

C. As to violations of HIPAA, the following;

    i. Defendants, individuals and entities, be imprisoned for not more than 10 years, a $250,000 fine, or both, for each scheme not resulting in bodily injury;

    ii. Defendants, individuals and entities, be imprisoned for not more than 20 years, for each scheme resulting in bodily injury; and

    iii. Defendants, individuals and entities, be imprisoned where a life sentence may be imposed for each instance of patient death resulting from Defendants' scheme to defraud.

D. Relator further requests all other relief to which Plaintiff United States of America and Relator James Hugh Potts II are justly entitled, whether in law or in equity.

E. As to violations of the Georgia State False Medicaid Claims Act, the following:

    i. Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

    ii. Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

    iii. A penalty not less than $5,500.00 or more than $11,000.00 for each false or fraudulent claim, plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person.

    iv. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under O.C.G.A. § 49-4-168, whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

F. As to violations of the California False Claims Act, the following:

    i. Judgment against the Defendants for the value of any payment provided under the Medicaid program,

directly or indirectly, as a result of the unlawful acts.

ii.  Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.  A penalty of three times the amount of damages that the state or political subdivision sustains because of the acts of Defendants or the costs of this civil action brought to recover any of those penalties or damages and a civil penalty of not less than $5,000.00 or more than $10,000.00 for each violation.

iv.  Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the California False Claims Act  §§ 12650-12656, whether specified in this pleading or not.  Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

G. As to violations of the Colorado Medical Assistance Act, the following:

i.  Judgment against the Defendants for the value of any payment provided under the Medicaid program,

directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation, plus three times the amount of damages that the state sustains because of the acts of Defendants.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Colorado Medical Assistance Act, Colo. Rev. Stat. §§ 25.5-4-304 to 25.5-4-310, 25.5-4-305 (a), (b) and (g), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

H. As to violations of the Connecticut False Claims Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program,

directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.  A civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation, plus three times the amount of damages that the state sustains because of the acts of Defendants, and the costs of investigation and prosecution of the violations.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Connecticut False Claims Act § 17b-301b(a)(1), (2) and (3), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

I. As to violations of the Delaware False Claims and Reporting Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program,

directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,500.00 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of damages, which the Government sustains because of the act(s) of Defendants.

iv.   Defendants be held liable for the costs of a civil action brought to recover any such penalty or damages, including payment of reasonable attorneys fees and costs for violations of this statute.

v.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201-1209, 1201(a)(1), (2), (3) and (c), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

J. As to violations of the Florida False Claims Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation, plus three times the amount of damages that the agency sustains because of the act(s) or omission(s) of Defendants, and the costs of investigation and prosecution of the violations.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Florida False Claims Act § 68.082(2)(a), (b) and (c), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

K. As to violations of the Illinois False Claims Act, the following:

i. Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii. Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii. A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation, plus three times the amount of damages that the State sustains because of each act of Defendants, and the costs of investigation and prosecution of the violations.

iv. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Illinois False Claims Act § 3(a)(1)(A), (B) and (C), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

101

L. As to violations of the Indiana False Claims and Whistleblower Protection Act, the following:

    i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

    ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

    iii.   A civil penalty of at least $5,000.00 and for up to 3 times the amount of damages sustained by the state, plus the costs of a civil action brought to recover a penalty or damages.

    iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5, whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

M. As to violations of the Louisiana Medical Assistance Programs Integrity Law, the following:

i.    Judgment against the Defendants for the actual damages incurred as a result of a violation of the provisions of this Part shall be recovered only once by the medical assistance programs and shall not be waived by the court.

ii.    The actual damages actual damages shall equal the difference between what the medical assistance programs paid, or would have paid, and the amount that should have been paid had not a violation of this Part occurred plus interest at the maximum rate of legal interest provided by Civil Code Article 2924 from the date the damage occurred to the date of repayment.

iii.    For any managed care or health care provider voucher programs in which Defendants participate, the actual damages shall be determined in accordance with the violator's provider agreement.

iv.    A civil fine in an amount not to exceed 3 times the amount of actual damages sustained by the medical assistance programs as a result of the violation.

v.    A civil penalty in addition to the actual damages and civil fine of up to $10,000.00 for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act as contained in R.S. 46:438.2, R.S. 46:438.3, or 46:438.4.

vi.    Payment of interest on the amount of the civil fine imposed pursuant to Subsection B of this Section at the maximum rate of legal interest provided by Civil Code Article 2924 from the date the damage occurred to the date of repayment.

vii.    All costs, expenses, and fees related to investigations and proceeding associated with the violation including attorney fees.

viii.    Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 438, whether specified in this pleading or not.  Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

N. As to violations of the Massachusetts False Claims Act, the following:

i.    Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.    Interest on the value of the payment or benefit described above at the prejudgment rate in effect on

the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,000.00 and not more than $10,000.00 per violation, plus 3 times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the acts of Defendants.

iv.   Expenses of the civil action brought to recover any such penalty or damages, including without limitation reasonable attorney's fees, reasonable expert's fees and the costs of investigation, including the costs of any review or investigation undertaken by the attorney general, or by the state auditor or the inspector general in cooperation with the attorney general.

v.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 §§ 5-50, 5B (1), (2), (3), (7) and (9), whether specified in this pleading or not.  Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to

this issue and under the laws as determined by this court.

O. As to violations of the Michigan Medicaid False Claim Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.  Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii. Defendants be found guilty of a felony (felonies), punishable by imprisonment for not more than 10 years, or by a fine of not more than $50,000.00, or both for violating sections 400.606.

iv.  Defendants be found guilty of a felony (felonies), punishable by imprisonment for not more than 4 years, or by a fine of not more than $50,000.00, or both for violating sections 400.607.

v.   A civil penalty for each claim of not less than $5,000.00 or more than $10,000.00, plus 3 times the amount of damages suffered by the state as a result of the conduct by the Defendants.

vi.    Expenses of the civil action brought to recover any such penalty or damages, including without limitation reasonable attorney's fees, reasonable expert's fees and the costs of investigation, including the costs of any review or investigation undertaken by the attorney general, or by the state auditor or the inspector general in cooperation with the attorney general.

vii.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Michigan Medical False Claim Act, Mich. Comp. Laws §§ 400.601-400.612, whether specified in this pleading or not.    Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

P. As to violations of the Minnesota False Claims Act, the following:

i.    Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on

the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii. A civil penalty of not less than $5,500.00 and not more than $11,000.00 per false or fraudulent claim, plus three times the amount of damages that the state or the political subdivision sustains because of the act(s) of Defendants.

iv. Costs, reasonable attorneys fees, and the reasonable fees of expert consultants and expert witnesses.

v. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq., whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

Q. As to violations of the Nevada False Claims Act, the following:

i. Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.    Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   Three times the amount of damages sustained by the State or political subdivision because of the act of that person, for the costs of a civil action brought to recover those damages and for a civil penalty of not less than $5,000 or more than $10,000 for each act.

iv.    Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.010-357.250, whether specified in this pleading or not.  Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

R. As to violations of the New Mexico Medicaid False Claims Act, the following:

i.    Judgment against the Defendants for the three times the amount of damages the state sustains as a result of the unlawful acts.

ii. Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the New Mexico Medicaid False Claims Act, §§ 27-14-1 to 27-14-15, whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

S. As to violations of the New Mexico Fraud Against Taxpayers Act, the following:

i. Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii. Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii. Three times the amount of damages sustained by the State because of the act(s) of Defendants, for the

110

costs of a civil action brought to recover those damages including reasonable attorney fees and he fees of the attorney general or state agency counsel.

    iv.  A civil penalty of not less than $5,000 and not more than $10,000 for each violation.

T. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the New Mexico Fraud Against Taxpayers Act, §§ 44-9-1 to 44-9-14, whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

U. As to violations of the Oklahoma Medicaid False Claims Act, the following:

    i.  Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

    ii.  Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,000 or more than $10,000 for each act, plus three times the amount of damages the state sustains because of the act(s) of the Defendants.

iv.   Attorney fees, expenses and costs for bringing and prosecuting the action regarding Defendants' false claims.

v.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63. §§ 5053-5053.7, whether specified in this pleading or not.   Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

V. As to violations of the Tennessee False Claims Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on

the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii. A civil penalty of not less than $2,500 and not more than $10,000 for each false claim, plus three times the amount of damages that the state or political subdivision sustains because of the act(s) of the Defendants.

iv. Attorney fees, expenses and costs for bringing and prosecuting the action regarding Defendants' false claims.

v. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 to 4-18-108, whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

W. As to violations of the Texas Medicaid Fraud Prevention Law, the following:

i. Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.  A civil penalty of not less than $5,500 and not more than $15,000 for each unlawful act if that unlawful act results in injury to an elderly person or a person younger than 18 years of age, plus two times the amount of the payment or value of the benefit.

iv.   A civil penalty of not less than $5,500 and not more than $11,000 for each unlawful act if the unlawful act does not result in an injury to an elderly person or a person younger than 18 years of age, plus two times the amount of the payment or value of the benefit.

v.    Attorney's fees, expenses and costs for bringing and prosecuting the action regarding Defendants' false claims.

vi.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001 to 36.132, whether specified in this pleading or not.  Plaintiff will seek an amount as civil penalties that will be justified and

appropriate under the facts relevant to this issue and under the laws as determined by this court.

X. As to violations of the Virginia Fraud Against Taxpayers Act, the following:

i. Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii. Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii. A civil penalty of not less than $5,500 and not more than $11,000 for each act, plus three times the amount of damages sustained by the Commonwealth.

iv. Attorney fees, expenses and costs for bringing and prosecuting the action regarding Defendants' violations of the Virginia Fraud Against Taxpayers Act.

v. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 to 8.01-216.19, whether specified in this pleading or not. Plaintiff will seek an

amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby demand trial by jury.

This [18TH] day of February, 2014.

_____
James Hugh Potts II
Attorney for Plaintiff
Georgia Bar No. 58567

JAMES HUGH POTTS II, LLC
1348 Ponce de Leon Avenue NE
Atlanta, Georgia 30306
404-812-0000
www.jhpii.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 1 8 2014

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES OF AMERICA        )
Ex Rel. JAMES HUGH POTTS II, and )
STATE OF GEORGIA Ex Rel. JAMES   )
HUGH POTTS II, *ET AL*            )
                                 )
          Plaintiffs,            )     CIVIL ACTION NO.
                                 )     1:12-CV-0963
                                 )
VS.                              )     FILED EX PARTE
                                 )     AND UNDER SEAL
                                 )
UNIVERSAL HEALTH SERVICES, INC., )
*ET AL*                           )     JURY DEMANDED

### CERTIFICATE OF SERVICE

This will certify that I have this day caused to be served a copy of the within and forgoing Plaintiff's 4th Amended Complaint upon the following parties by placing the same in the United States Mail, postage prepaid or by electronic delivery addressed to:

**United States of America**
Lena Amanti
Assistant United States
Attorney
Northern District of Georgia
Richard B. Russell Federal
Building
75 Spring Street
Atlanta, GA 30303
(404) 581-6225
lena.amanit@usdoj.gov

**California Attorney General**
Steven U. Ross
Deputy Attorney General IV
Bureau of Medi-Cal Fraud
Office of the Attorney
General
California Department of
Justice

110 West "a" Street, Suite
1100
San Diego, CA 92101-3702
619-688-6026
steven.ross@doj.ca.gov

**Colorado Attorney General**
George A. Codding
Civil Litigation and Qui Tam
Coordinator
Senior Assistant Attorney
General
Medicaid Fraud Control Unit
Office of the Attorney
General
(702) 508-6686
George.codding@state.co.us

**Connecticut Attorney General**
Robert B. Teitelman
Assistant Attorney General

55 Elm Street
Hartford, CT 06106-1774
860-808-5040
Robert.teitelman@ct.gov

**Delaware Attorney General**
Tiphanie P. Miller
Deputy Director
Medicaid Fraud Control Unit
State of Delaware Department
of Justice
900 North King Street, 4th
Floor
Wilmington, DE 19802
(303) 577-4208

**Illinois Attorney General**
Robert Barba, Esq.
Assistant Attorney General
Office of the Illinois
Attorney General
100 West Randolph Street, 12th
Floor
Chicago, IL 60601
312-814-4498
Rbarba@atg.state.il.us

**Florida Attorney General**
Jill Bennett
MFCU-Complex Civil
Enforcement Bureau
Office of the Attorney
General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850)414-3913
jill.bennett@myfloridalegal.c
om

**Indiana Attorney General**
Steven Hunt
Supervising Deputy Attorney
Medicaid Fraud Control Unit
8005 Castleway Drive
Indianapolis, Indiana 46250
(317) 915-5320
steven.hunt@atg.in.gov

**Massachusetts Attorney
General**
Steven L. Hoffman

Assistant Attorney
General/Deputy Chief
Medicaid Fraud Division
One Ashburton Place
Boston, MA 02108
(617) 963-2389
Steven.hoffman@state.ma.us

**Michigan Attorney General**
Susan I. Hellerman
Assistant Attorney General
Health Care Fraud Division
MI Dept. of Attorney General
2860 Eyde Pkway
E. Lansing, MI 48823
(517) 241-1023
hellermanS@michigan.gov

**Nevada Attorney General**
Mark N. Kemberling
Chief Deputy Attorney General
555 East Washington Ave., Ste
3900
Las Vegas, NV 89101
(702) 486-3111
mkemberling@ag.nv.gov

**New Mexico**
Jody R. Curran
Division Director
Medicaid Fraud & Elder Abuse
Division
Office of the State Attorney
General
111 Lomas Blvd. NW, Suite 300
Albuquerque, New Mexico 87102
(505) 222-9080
jcurran@nmag.gov

**Oklahoma Attorney General**
Christopher Robinson
Assistant Attorney General
Medicaid Fraud Control Unit
Oklahoma Office of Attorney
General
313 NE 21st Street
Oklahoma City, OK 73105
(405) 522-2968
Christopher.robinson@oag.ok.g
ov

**Tennessee Attorney General**

Elijah W. Swiney                    Medicaid Fraud Unit, Civil
Assistant Attorney General          Investigations Squad
Medicaid Fraud & Integrity          Virginia Attorney General's
Division                            Office
P.O. Box 20207                      900 East Main Street
Nashville, TN 37202                 Richmond, VA 23219
(615) 741-3519                      (804) 786-7760
eli.swiney@ag.tn.gov                mholt@oag.state.va.us

**Virginia Attorney General**
Megan L. Holt, Esq.
Assistant Attorney General

**THESE DOCUMENTS HAVE NOT BEEN SERVED ON THE DEFENDANTS BECAUSE THIS CASE REMAINS UNDER SEAL**

This 18th Day of February, 2014,

Respectfully Submitted

James Hugh Potts II
Georgia Bar No. 585677